Catherine J. HEALY et al., Plaintiffs,

v.

F. Don JAMES et al., Defendants.

Civ. A. No. 13721.

United States District Court,
D. Connecticut.

Oct. 29, 1970.

Alvin Pudlin, Abraham S. Silver, Pudlin & Silver, New Britain, Conn., for plaintiffs.

F. Michael Ahern, Asst. Atty. Gen., State of Conn., Hartford, Conn., for defendants.

## RULING ON MOTION TO REJECT FINDINGS AND SUMMARY JUDGMENT

CLARIE, District Judge.

Jurisdiction in Healy v. James, 311 F.Supp. 1275 (D.Conn. 1970), was retained by this Court and an evidentiary hearing ordered on plaintiffs' application requesting official campus recognition of a local chapter of the Students for a Democratic Society (SDS). The purpose of said hearing was to hear evidence and ascertain whether or not the proposed group had among its aims and purposes the philosophy of violent activism.

The College President appointed Richard L. Judd, Dean of Student Affairs, as his representative hearings officer to carry out the Court's order, so that the applicants would be afforded a hearing. After due notice to the parties, evidentiary hearings were had on May 19th and May 25th, 1970, respectively. Two of the original applicants accompanied by retained counsel and several interested persons attended these hearings. Exhibits were filed by the petitioners and the respondents, testimony was offered, arguments of counsel presented and a complete verbatim transcript of these proceedings was made.

After having reviewed this transcript of the evidence as well as the exhibits, President James filed his decision on July 10, 1970, in which he reaffirmed his earlier findings and denied official college recognition to the proposed SDS

chapter, together with his reasons for these conclusions. After a copy of that decision had been received by plaintiffs' counsel, the plaintiffs moved that this Court reject the findings of President James and grant the equitable relief which the plaintiffs had originally sought. Their proposed remedy would have afforded them the right to form a local chapter of the SDS at Central Connecticut State College (CCSC) with official campus recognition by the college administration. The Court will treat the pending motion, as if cross-motions for summary judgment had been filed by the parties; and it finds that the plaintiffs' constitutional claims are without merit, accordingly it denies their prayer for equitable relief and orders a dismissal of the action.

The court-ordered administrative hearing added some elements of factual substance to the plaintiffs' original application. Certainly, the formal requisites of administrative procedural due process have now been met. Both parties had the opportunity to supplement and complete the prior record,[1] not only on the issue of whether the local chapter of SDS was affiliated with the national organization, but also offered an opportunity for the college administration to place in evidence factual support for the conclusions which President James found, and which he claims warranted his denial of plaintiffs' application. The plaintiffs' supplemental evidence consisted primarily of one written "statement," Plaintiffs' Exhibit #1, purporting to change that part of the name of the applicant organization, which originally referred to itself as a local chapter of the SDS and to reaffirm its alleged unaffiliated status. The relevent part stated:

"(T)hat the proposed organization shall be called Students for a Democratic Society of Central Connecticut State College, and it shall have no connection whatsoever to the structure of an existing national organization, or organizations, bearing the name Students for a Democratic Society. Furthermore, the organization shall be unaffiliated with any other organization."

The hearings officer offered *sua sponte* several exhibits [2] disclosing the historical sequence in the processing of the application, and several Congressional hearings' transcripts of testimony under oath, which pertained to the inherent nature of the national SDS organization. These latter documents reviewed the history of the national organization's turbulent and violent activities on other campuses, as well as its openly declared anarchistic objectives, both political and social. A complete transcript of the hearings officer's report, together with all the exhibits have been filed with this Court.

The Student Affairs Committee initially received on October 2, 1969 the petitioners' application requesting official campus approval. This committee composed of the Dean of Students, four faculty members and three students, had been delegated with the power to "recommend for faculty approval the policies and procedures for the establishment and recognition of all clubs, groups and organizations at the college." [3]

The committee's authority was specifically limited however, by the Board of Trustees, through a general policy statement governing the function and responsibilities of such groups. This limitation provided:

"The President of the College, having the ultimate responsibility for the operation of the college, shall have veto power concerning all policy recommendations. All Faculty Senate and Departmental appointments to committees are subject to the approval of the President." [4]

---

1. Defendants' Exhibit "I".

2. Hearings Officer's Exhibits "G", "H", "I" and "N".

3. Functions and Responsibilities of Standing Faculty Committees, p. 14.

4. Functions and Responsibilities of Standing Faculty Committees, p. 1.

Thus, the final decision of that committee was clearly subject to the veto of the College President.

At the October meeting, when the original application was being considered by the committee, representatives of the group were asked how they would respond to issues of violence as compared to the action taken by other SDS chapters, where violence had in fact erupted on college campuses. Their response was significantly evasive and obtuse; it was consistent with and typical of a generally recognized pattern of response, by those who are known to foster subversive and violent conduct. They stated, "our action would have to depend on each issue." When pressed on the means of action to be used, the response again was in similar vein. When specifically asked whether they could foresee the organization's activities interrupting a college classroom activity, their reponse was that it was impossible to say.[5] The committee's action was deferred until October 13, 1969, when supplemental data was to be submitted. At the latter meeting, the question was asked as to the meaning of the term "local chapter," as it related to the national alliance. The response was that there was no such thing as an SDS national and the members wanted to keep a loose arrangement, so as to pick ideas from several of the factioned groups; furthermore, the concept of SDS exists in the minds of those who run it. At the conclusion of the meeting, the Student Affairs Committee voted 6–2 to record their approval of the local chapter as an approved campus club. However, this was done with the proviso that they would consider immediate suspension of the local chapter, if its activities, programs and functions were incompatible with those of the college, under Chapter Section 5-E relating to a Statement on Rights, Freedoms and Responsibilities of Students [6] which reads in part:

"Students do not have the right to deprive others of the opportunity to speak or to be heard, to invade the privacy of others, to damage the property of others, to disrupt the regular and essential operation of the College, or to interfere with the rights of others."

An additional reason advanced by the majority of the Student Affairs Committee to justify their action in approving recognition, was that they had approved it in order to allow students the opportunity to exchange ideas through an organization in the academic market place.

A minority report of that same committee expressed their dissenting reasons for voting to deny the application, namely: (1) that the organization did not submit a specific constitution and thus failed to conform to the requirements for recognition; (2) the use of the descriptive term "local chapter" while denying affiliation with any national organization provides a lack of clarity, and (3) that while it was not the minority's intention to exclude any left wing group as such, they were opposed to the nature of the present organization for approval, as an officially approved campus organization.[7]

The College President's final decision, as expressed in his letter of July 10, 1970, to the acting Dean of Student Affairs, reaffirmed his prior ruling denying approval of the plaintiffs' application. The reasons for his action were (1) that if the group utilizes the name of an existing organization, how can it be totally free from the dictates of that organization; (2) Article III of the national SDS constitution provides for independent groups who may affiliate as associates, which chapters are expected to operate within the broad term of policies set by the national convention and the national council; (3) the documentary exhibits submitted indicated to

5. Hearings Officer's Exhibit "O", p. 3.
6. Plaintiffs' Exhibit "B".

7. Hearing Officer's Exhibit "P", p. 3.

him that their prospective campus activities were likely to cause a disruptive influence at CCSC.

President James' decision is consistent with the college policy Statement on the Rights, Freedoms and Responsibilities of Students.[8] It fulfills in a responsive manner the authority entrusted to him, by the Board of Trustees of State Colleges and the statutory duties assigned to that Board by the Legislature.[9] Nothing in his administrative decision interferes with the constitutionally protected rights of freedom of speech or association by individuals or groups of individuals. It is not in the same category as a criminal prosecution involving the teaching or espousing of revolution; nor does it attempt civilly to enjoin those utterances which might be considered as an imminent threat to order. See, Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). All that is denied is the college administration's stamp of approval on the organization as an officially accepted and recognized campus club with its attendant privileges. Should these applicants wish to form such an SDS organization off the college campus, there are no rules to prevent it, nor has there been any attempt by the college authorities to do so. The College President's responsibility is fulfilled, when he has provided reasonable assurance of an educational environment designed to enhance the learning process and free it from any organized group likely to cause violent acts of disruption on campus.

"Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. On the other hand, '(t)he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools,' Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960)." Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L. Ed.2d 228 (1968).

President James' discretionary action in denying this application cannot be legitimately magnified and distorted into a constitutionally cognizable interference with the personal ideas or beliefs of any segment of the college students; neither does his action deter in any material way the individual advocacy of their personal beliefs; nor can his action be reasonably construed to be an invasion of, or having a chilling effect on academic freedom.

What is denied to this plaintiff-group is the privileged position of acting from within the college structure, as an officially approved campus organization. The historical record of their application discloses that the plaintiffs have not met their burden of complying with the college standards established by the declaration of rights, freedoms and responsibilities of students adopted and approved by the school administration.[10] Until they do so conform, they have no constitutional or other right to have the administrative seal of official college respectability conferred upon them under the theory of constitutional equal protection. The opportunity of an open dialogue, with a free, uninhibited but respectful expression of ideas between teacher and student, scholar and scholar, with its attendant critical exchange exposed to full view, creates the epitome of the college students' never ending search for truth. This autonomy of intellectual freedom of academic expression has not been materially deterred or lessened by the College President's action. He is held responsible for the climate of campus discipline. To be effective in carrying out his responsibilities, he must be afforded broad discretionary authority with which to achieve it.

"We * * * hold that a college has the inherent power to promulgate rules and regulations; that it has the inherent power properly to discipline;

---

8. See footnote 6, supra.

9. Conn.Gen.Stat. §§ 10–109, 10–109b.

10. See footnote 6, supra.

that it has power appropriately to protect itself and its property; that it may expect that its students adhere to generally accepted standards of conduct." Esteban v. Central Missouri State College, 415 F.2d 1077, 1089 (8 Cir. 1969).

The applicants have not sustained their burden of demonstrating that their identifying with the national corporate name of the SDS permits them to function with absolute freedom from the dictates, influence and image of the national organization, notwithstanding their verbal protests to the contrary. President James found that Article III of the SDS national constitution recognizes local chapters and affiliates and it expects their cooperation. In a practical sense, it would be impossible for the college administration or the public at large, to ascertain at any given time, the true relationship or open honest objectives of these identically named organizations, despite its claim to being a separate entity.

The evidence clearly and unequivocally discloses that the philosophy and purposes of the national organization advocate the violent overthrow of existing government institutions, through the medium of disruptive anarchistic force. The College President responsibly concluded that "recognition of such a group would be contrary to the orderly process of change and would be contrary to the philosophy and lawful mission of this College." This Court finds that his decision was validly arrived at and violated no constitutional rights of the plaintiffs under the first and fourteenth amendments to the federal constitution.

This Court is not persuaded by the plaintiffs' representation that the refusal of campus approval denies them equal protection. Were their theory adopted, precedent would demand approval of all purported unaffiliated chapters as a matter of right, not only on every college campus but every high school campus as well. Under the mask of cherished academic freedom, local cell-units would be free to insist on the right to operate from within the organized structure of every school campus in the nation. It would follow that this should include the right to import, under the guise of freedom of speech, professional agitators whose openly professed objectives are educational disruption and disorder, through the exemplification of the philosophy of violent activism and anarchy.

As this Court said in Zemel v. Rusk, 228 F.Supp. 65, 71 (1964), "Personal vigilance to safeguard freedom should never be permitted to become a sword used for the destruction of the edifice it protects it is protecting." The plaintiffs' motion is denied; summary judgment is granted to the defendants and the action is dismissed. So ordered.