# HEALY ET AL. *v.* JAMES ET AL.

No. 71–452.  Argued March 28, 1972—Decided June 26, 1972

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined. BURGER, C. J., filed a concurring opinion, *post,* p. 195. DOUGLAS, J., filed a separate opinion, *post,* p. 196. REHNQUIST, J., filed a statement concurring in the result, *post,* p. 201.

*Melvin L. Wulf* argued the cause for petitioners. With him on the brief were *Eugene Z. DuBose, Jr., Alvin Pudlin,* and *Sanford Jay Rosen.*

*F. Michael Ahern,* Assistant Attorney General of Connecticut, argued the cause for respondents. With him on the brief was *Robert K. Killian,* Attorney General.

Briefs of *amici curiae* urging affirmance were filed by *Evelle J. Younger,* Attorney General of California, and *Donald B. Day,* Deputy Attorney General, for the Board of Trustees of California State Colleges; by *Frank G. Carrington, Jr.,* and *Alan S. Ganz* for Americans for Effective Law Enforcement, Inc.; and by *Morris I. Leibman* and *Philip B. Kurland* for the American Association of Presidents of Independent Colleges and Universities.

MR. JUSTICE POWELL delivered the opinion of the Court.

This case, arising out of a denial by a state college of official recognition to a group of students who desired to form a local chapter of Students for a Democratic Society (SDS), presents this Court with questions requiring the application of well-established First Amendment principles. While the factual background of this

particular case raises these constitutional issues in a manner not heretofore passed on by the Court, and only infrequently presented to lower federal courts, our decision today is governed by existing precedent.

As the case involves delicate issues concerning the academic community, we approach our task with special caution, recognizing the mutual interest of students, faculty members, and administrators in an environment free from disruptive interference with the educational process. We also are mindful of the equally significant interest in the widest latitude for free expression and debate consonant with the maintenance of order. Where these interests appear to compete the First Amendment, made binding on the States by the Fourteenth Amendment, strikes the required balance.

## I

We mention briefly at the outset the setting in 1969–1970. A climate of unrest prevailed on many college campuses in this country. There had been widespread civil disobedience on some campuses, accompanied by the seizure of buildings, vandalism, and arson. Some colleges had been shut down altogether, while at others files were looted and manuscripts destroyed. SDS chapters on some of those campuses had been a catalytic force during this period.[1] Although the causes of campus disruption were many and complex, one of the prime consequences of such activities was the denial of the lawful exercise of First Amendment rights to the majority of students by the few. Indeed, many of the most cherished characteristics long associated with institutions of higher learning appeared to be endangered. For-

[1] See Report of the President's Commission on Campus Unrest (1970); Report of the American Bar Association Commission on Campus Government and Student Dissent (1970).

tunately, with the passage of time, a calmer atmosphere and greater maturity now pervade our campuses. Yet, it was in this climate of earlier unrest that this case arose.

Petitioners are students attending Central Connecticut State College (CCSC), a state-supported institution of higher learning. In September 1969 they undertook to organize what they then referred to as a "local chapter" of SDS. Pursuant to procedures established by the College, petitioners filed a request for official recognition as a campus organization with the Student Affairs Committee, a committee composed of four students, three faculty members, and the Dean of Student Affairs. The request specified three purposes for the proposed organization's existence. It would provide "a forum of discussion and self-education for students developing an analysis of American society"; it would serve as "an agency for integrating thought with action so as to bring about constructive changes"; and it would endeavor to provide "a coordinating body for relating the problems of leftist students" with other interested groups on campus and in the community.[2] The Committee, while satisfied that the statement of purposes was clear and unobjectionable on its face, exhibited concern over the relationship between the proposed local group and the National SDS organization. In response to inquiries, representatives of the proposed organization stated that they would not affiliate with any national organization and that their group would remain "completely independent."

In response to other questions asked by Committee members concerning SDS' reputation for campus disruption, the applicants made the following statements,

---

[2] The statement of purposes is set out as an Appendix to the Second Circuit's opinion and appears following the dissent thereto. 445 F. 2d 1122, 1135–1139 (1971).

▆▆▆▆▆▆▆▆▆▆

which proved significant during the later stages of these proceedings:

> "Q. How would you respond to issues of violence as other S. D. S. chapters have?
>
> "A. Our action would have to be dependent upon each issue.
>
> "Q. Would you use any means possible?
>
> "A. No I can't say that; would not know until we know what the issues are.
>
> .      .      .      .      .
>
> "Q. Could you envision the S. D. S. interrupting a class?
>
> "A. Impossible for me to say."

With this information before it, the Committee requested an additional filing by the applicants, including a formal statement regarding affiliations. The amended application filed in response stated flatly that "CCSC Students for a Democratic Society are not under the dictates of any National organization." [3] At a second hearing before the Student Affairs Committee, the question of relationship with the National organization was raised again. One of the organizers explained that the National SDS was divided into several "factional groups," that the national-local relationship was a loose one, and that the local organization accepted only "certain ideas" but not all of the National organization's aims and philosophies.

By a vote of six to two the Committee ultimately approved the application and recommended to the Pres-

---

[3] 445 F. 2d, at 1133. During the Committee's consideration of petitioners' application, one of the group's representatives was asked why, if it indeed desired to remain independent, it chose to use a nationally known name. The witness' response was that "the name brings to mind the type of organization we wish to bring across, that is, a left-wing organization which will allow students interested in such to express themselves."

ident of the College, Dr. James, that the organization be accorded official recognition. In approving the application, the majority indicated that its decision was premised on the belief that varying viewpoints should be represented on campus and that since the Young Americans for Freedom, the Young Democrats, the Young Republicans, and the Liberal Party all enjoyed recognized status, a group should be available with which "left wing" students might identify. The majority also noted and relied on the organization's claim of independence. Finally, it admonished the organization that immediate suspension would be considered if the group's activities proved incompatible with the school's policies against interference with the privacy of other students or destruction of property. The two dissenting members based their reservation primarily on the lack of clarity regarding the organization's independence.

Several days later, the President rejected the Committee's recommendation, and issued a statement indicating that petitioners' organization was not to be accorded the benefits of official campus recognition. His accompanying remarks, which are set out in full in the margin,[4] indicate several reasons for his action. He

---

[4] The President stated:

"Though I have full appreciation for the action of the Student Affairs Committee and the reasons stated in their minutes for the majority vote recommending approval of a local chapter of Students for a Democratic Society, it is my judgment that the statement of purpose to form a local chapter of Students for a Democratic Society carries full and unmistakable adherence to at least some of the major tenets of the national organization, loose and divided though that organization may be. The published aims and philosophy of the Students for a Democratic Society, which include disruption and violence, are contrary to the approved policy (by faculty, students, and administration) of Central Connecticut State College which states:

" 'Students do not have the right to invade the privacy of others, to damage the property of others, to disrupt the regular and es-

found that the organization's philosophy was antithetical to the school's policies,[5] and that the group's independence was doubtful. He concluded that approval should

sential operation of the college, or to interfere with the rights of others.'

"The further statement on the request for recognition that 'CCSC Students for a Democratic Society are not under the dictates of any National organization' in no way clarifies why if a group intends to follow the established policy of the college, they wish to become a local chapter of an organization which openly repudiates such a policy.

"Freedom of speech, academic freedom on the campus, the freedom of establishing an open forum for the exchange of ideas, the freedoms outlined in the Statement on Rights, Freedoms, and Responsibilities of Students that 'college students and student organizations shall have the right to examine and discuss all questions of interest to them, to express opinion publicly and privately, and to support causes by orderly means. They may organize public demonstrations and protest gatherings and utilize the right of petition'—these are all precious freedoms that we cherish and are freedoms on which we stand. To approve any organization or individual who joins with an organization which openly repudiates those principles is contrary to those freedoms and to the approved 'Statement on the Rights, Freedoms, and Responsibilities of Students' at Central." App. 15–16.

[5] In 1969, CCSC adopted, as have many other colleges and universities, a Statement on Rights, Freedoms and Responsibilities of Students. This statement, commonly referred to as the "Student Bill of Rights," is printed as an Appendix to the Second Circuit's majority opinion in this case, 445 F. 2d, at 1135–1139, see n. 2, *supra*. Part V of that statement establishes the standards for approval of campus organizations and imposes several basic limitations on their campus activities:

"A. Care shall be taken in the establishment and organization of campus groups so that the basic rights, freedoms and responsibilities of students will be preserved.

"B. Student organizations shall submit a clear statement of purpose, criteria for membership, rules of procedures and a list of officers as a condition of institutional recognition. They shall not be required to submit a membership list as a condition of institutional recognition.

"C. Membership in campus organizations shall be limited to

not be granted to any group that "openly repudiates" the College's dedication to academic freedom.

Denial of official recognition posed serious problems for the organization's existence and growth. Its members were deprived of the opportunity to place announcements regarding meetings, rallies, or other activities in the student newspaper; they were precluded from using various campus bulletin boards; and—most importantly—nonrecognition barred them from using campus facilities for holding meetings. This latter disability was brought home to petitioners shortly after the President's announcement. Petitioners circulated a notice calling a meeting to discuss what further action should be taken in light of the group's official rejection. The members met at the coffee shop in the Student Center ("Devils' Den") but were disbanded on the President's order since nonrecognized groups were not entitled to use such facilities.[6]

matriculated students (day or evening) at the college. Membership shall not be restricted by race, religion or nationality. The members shall have sole power to determine organization policy consistent with the regulations of the college.

"D. Each organization is free to choose its own adviser. Advisers to organizations shall advise but not control the organizations and their policies.

"E. College students and student organizations shall have the right to examine and discuss all questions of interest to them, to express opinion publicly and privately, and to support causes by orderly means. They may organize public demonstrations and protest gatherings and utilize the right of petition. Students do not have the right to deprive others of the opportunity to speak or be heard, to invade the privacy of others, to damage the property of others, to disrupt the regular and essential operation of the college, or to interfere with the rights of others."

[6] During the meeting petitioners were approached by two of the College's deans, who served petitioners with a memorandum from the President stating:

"Notice has been received by this office of a meeting of the

Their efforts to gain recognition having proved ultimately unsuccessful, and having been made to feel the burden of nonrecognition, petitioners resorted to the courts. They filed a suit in the United States District Court for the District of Connecticut, seeking declaratory and injunctive relief against the President of the College, other administrators, and the State Board of Trustees. Petitioners' primary complaint centered on the denial of First Amendment rights of expression and association arising from denial of campus recognition. The cause was submitted initially on stipulated facts, and, after a short hearing, the judge ruled that petitioners had been denied procedural due process because the President had based his decision on conclusions regarding the applicant's affiliation which were outside the record before him. The court concluded that if the President wished to act on the basis of material outside the application he must at least provide petitioners a hearing and opportunity to introduce evidence as to their affiliations. 311 F. Supp. 1275, 1279, 1281. While retaining jurisdiction over the case, the District Court ordered respondents to hold a hearing in order to clarify the several ambiguities surrounding the President's decision. One of the matters to be explored was whether the local organization, true to its repeated affirmations, was in fact independent of the National SDS. *Id.*, at 1282. And if the hearing demonstrated that the two were not separable, the respondents were instructed that they might then review the "aims and philosophy" of the National organization. *Ibid.*

'C. C. S. C.-S. D. S. on Thursday—November 6 at 7:00 p. m. at the Devils' Den.'

"Such meeting may not take place in the Devils' Den of the Student Center nor in or on any other property of the college since the C. C. S. C.-S. D. S. is not a duly recognized college organization.

"You are hereby notified by this action to cease and desist from meeting on college property."

Pursuant to the court's order, the President designated Dean Judd, the Dean of Student Affairs, to serve as hearing officer and a hearing was scheduled. The hearing, which spanned two dates and lasted approximately two hours, added little in terms of objective substantive evidence to the record in this case. Petitioners introduced a statement offering to change the organization's name from "CCSC local chapter of SDS" to "Students for a Democratic Society of Central Connecticut State College." They further reaffirmed that they would "have no connection whatsoever to the structure of an existing national organization."[7] Petitioners also introduced the testimony of their faculty adviser to the effect that some local SDS organizations elsewhere were unaffiliated with any national organization. The hearing officer, in addition to introducing the minutes from the two pertinent Student Affairs Committee meetings, also introduced, *sua sponte,* portions of a transcript of hearings before the United States House of Representatives Internal Security Committee investigating the activities of SDS. Excerpts were offered both to prove that violent and disruptive activities had been attributed to SDS elsewhere and to demonstrate that there existed a national organization that recognized and cooperated with regional and local college campus affiliates. Petitioners did not challenge the asserted existence of a National SDS, nor did they question that it did have a system of affiliations of some

[7] 319 F. Supp. 113, 114 (1970). The hearing officer, over petitioners' objection, ruled that the statement was inadmissible, apparently on the ground that it would constitute an amendment to the original application and would be beyond the permissible scope of the hearing. Whatever the merits of this ruling, the statement was in the record reviewed by the President and was relied on in the subsequent District Court opinion without reference to its prior exclusion. *Ibid.*

sort. Their contention was simply that their organization would not associate with that network. Throughout the hearing the parties were acting at cross purposes. What seemed relevant to one appeared completely immaterial to the other. This failure of the hearing to advance the litigation was, at bottom, the consequence of a more basic failure to join issue on the considerations that should control the President's ultimate decision, a problem to which we will return in the ensuing section.

Upon reviewing the hearing transcript and exhibits, the President reaffirmed his prior decision to deny petitioners recognition as a campus organization. The reasons stated, closely paralleling his initial reasons, were that the group would be a "disruptive influence" at CCSC and that recognition would be "contrary to the orderly process of change" on the campus.

After the President's second statement issued, the case then returned to the District Court, where it was ordered dismissed. The court concluded, first, that the formal requisites of procedural due process had been complied with, second, that petitioners had failed to meet their burden of showing that they could function free from the National organization, and, third, that the College's refusal to place its stamp of approval on an organization whose conduct it found "likely to cause violent acts of disruption" did not violate petitioners' associational rights. 319 F. Supp. 113, 116.

Petitioners appealed to the Court of Appeals for the Second Circuit where, by a two-to-one vote, the District Court's judgment was affirmed. The majority purported not to reach the substantive First Amendment issues on the theory that petitioners had failed to avail themselves of the due process accorded them and had failed to meet their burden of complying with the prevailing standards for recognition. 445 F. 2d 1122, 1131–1132. Judge

Smith dissented, disagreeing with the majority's refusal to address the merits and finding that petitioners had been deprived of basic First Amendment rights. *Id.,* at 1136. This Court granted certiorari and, for the reasons that follow, we conclude that the judgments of the courts below must be reversed and the case remanded for reconsideration.

## II

At the outset we note that state colleges and universities are not enclaves immune from the sweep of the First Amendment. "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker* v. *Des Moines Independent School District,* 393 U. S. 503, 506 (1969). Of course, as Mr. Justice Fortas made clear in *Tinker,* First Amendment rights must always be applied "in light of the special characteristics of the . . . environment" in the particular case. *Ibid.* And, where state-operated educational institutions are involved, this Court has long recognized "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.,* at 507. Yet, the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton* v. *Tucker,* 364 U. S. 479, 487 (1960). The college classroom with its surrounding environs is peculiarly the " 'marketplace of ideas,' " and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding aca-

demic freedom. *Keyishian* v. *Board of Regents,* 385 U. S. 589, 603 (1967); *Sweezy* v. *New Hampshire,* 354 U. S. 234, 249–250 (1957) (plurality opinion of Mr. Chief Justice Warren), 262 (Frankfurter, J., concurring in result).

Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs. While the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition. See, *e. g., Baird* v. *State Bar of Arizona,* 401 U. S. 1, 6 (1971); *NAACP* v. *Button,* 371 U. S. 415, 430 (1963); *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293, 296 (1961); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449 (1958) (Harlan, J., for a unanimous Court). There can be no doubt that denial of official recognition, without justification, to college organizations burdens or abridges that associational right. The primary impediment to free association flowing from nonrecognition is the denial of use of campus facilities for meetings and other appropriate purposes. The practical effect of nonrecognition was demonstrated in this case when, several days after the President's decision was announced, petitioners were not allowed to hold a meeting in the campus coffee shop because they were not an approved group.

Petitioners' associational interests also were circumscribed by the denial of the use of campus bulletin boards and the school newspaper. If an organization is to remain a viable entity in a campus community in which new students enter on a regular basis, it must possess the means of communicating with these students. Moreover, the organization's ability to participate in the intellectual give and take of campus debate, and to pursue its stated purposes, is limited by denial of access to the customary media for communicating with the admin-

istration, faculty members, and other students.[8]  Such impediments cannot be viewed as insubstantial.

Respondents and the courts below appear to have taken the view that denial of official recognition in this case abridged no constitutional rights.  The District Court concluded that

> "President James' discretionary action in deny-
> ing this application cannot be legitimately magni-
> fied and distorted into a constitutionally cognizable
> interference with the personal ideas or beliefs of
> any segment of the college students; neither does
> his action deter in any material way the individual
> advocacy of their personal beliefs; nor can his action
> be reasonably construed to be an invasion of, or
> having a chilling effect on academic freedom."  319
> F. Supp., at 116.

In that court's view all that was denied petitioners was the "administrative seal of official college respectabil-
ity."[9]  *Ibid.*  A majority of the Court of Appeals agreed that petitioners had been denied only the "col-
lege's stamp of approval."  445 F. 2d, at 1131.  Re-
spondents take that same position here, arguing that petitioners still may meet as a group off campus, that

---

[8] It is unclear on this record whether recognition also carries with it a right to seek funds from the school budget.  Petitioners' counsel at oral argument indicated that official recognition entitled the group to "make application for use of student funds."  Tr. of Oral Arg. 4.  The first District Court opinion, however, states flatly that "[r]ecognition does not thereby entitle an organization to college financial support."  311 F. Supp. 1275, 1277.  Since it appears that, at the least, recognition only entitles a group to *apply* for funds, and since the record is silent as to the criteria used in allocating such funds, we do not consider possible funding as an associational aspect of nonrecognition in this case.

[9] These statements are in contrast to the first opinion by the District Court, which reflected a full appreciation of the constitu-
tional significance of petitioners' claim.  311 F. Supp., at 1280–1282.

they still may distribute written material off campus, and that they still may meet together informally on campus—as individuals, but not as CCSC-SDS.

We do not agree with the characterization by the courts below of the consequences of nonrecognition. We may concede, as did Mr. Justice Harlan in his opinion for a unanimous Court in *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S., at 461, that the administration "has taken no direct action . . . to restrict the rights of [petitioners] to associate freely . . . ." But the Constitution's protection is not limited to direct interference with fundamental rights. The requirement in *Patterson* that the NAACP disclose its membership lists was found to be an impermissible, though indirect, infringement of the members' associational rights. Likewise, in this case, the group's possible ability to exist outside the campus community does not ameliorate significantly the disabilities imposed by the President's action. We are not free to disregard the practical realities. MR. JUSTICE STEWART has made the salient point: "Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates* v. *City of Little Rock,* 361 U. S. 516, 523 (1960). See also *Sweezy* v. *New Hampshire,* 354 U. S., at 263 (Frankfurter, J., concurring in result); *Watkins* v. *United States,* 354 U. S. 178, 197 (1957).

The opinions below also assumed that petitioners had the burden of showing entitlement to recognition by the College.[10] While petitioners have not challenged the procedural requirement that they file an application in conformity with the rules of the College,[11] they do

---

[10] 445 F. 2d, at 1131; 319 F. Supp., at 116.

[11] The standards for official recognition require applicants to provide a clear statement of purposes, criteria for membership, rules of procedure, and a list of officers. Applicants must limit member-

question the view of the courts below that final rejection could rest on their failure to convince the administration that their organization was unaffiliated with the National SDS. For reasons to be stated later in this opinion, we do not consider the issue of affiliation to be a controlling one. But, apart from any particular issue, once petitioners had filed an application in conformity with the requirements, the burden was upon the College administration to justify its decision of rejection. See, *e. g., Law Students Civil Rights Research Council* v. *Wadmond,* 401 U. S. 154, 162–163 (1971); *United States* v. *O'Brien,* 391 U. S. 367, 376–377 (1968); *Speiser* v. *Randall,* 357 U. S. 513 (1958). It is to be remembered that the effect of the College's denial of recognition was a form of prior restraint, denying to petitioners' organization the range of associational activities described above. While a college has a legitimate interest in preventing disruption on the campus, which under circumstances requiring the safeguarding of that interest may justify such restraint, a "heavy burden" rests on the college to demonstrate the appropriateness of that action. See *Near* v. *Minnesota,* 283 U. S. 697, 713–716 (1931); *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 418 (1971); *Freedman* v. *Maryland,* 380 U. S. 51, 57 (1965).

## III

These fundamental errors—discounting the existence of a cognizable First Amendment interest and misplac-

---

ship to "matriculated students" and may not discriminate on the basis of race, religion or nationality. The standards further state that groups may "examine and discuss all questions of interest," and they may conduct demonstrations and utilize their right of petition, but they are prohibited from interfering with the rights of other students. See n. 5, *supra.* Petitioners have not challenged these standards and their validity is not here in question.

ing the burden of proof—require that the judgments below be reversed. But we are unable to conclude that no basis exists upon which nonrecognition might be appropriate. Indeed, based on a reasonable reading of the ambiguous facts of this case, there appears to be at least one potentially acceptable ground for a denial of recognition. Because of this ambiguous state of the record we conclude that the case should be remanded, and, in an effort to provide guidance to the lower courts upon reconsideration, it is appropriate to discuss the several bases of President James' decision. Four possible justifications for nonrecognition, all closely related, might be derived from the record and his statements. Three of those grounds are inadequate to substantiate his decision: a fourth, however, has merit.

## A

From the outset the controversy in this case has centered in large measure around the relationship, if any, between petitioners' group and the National SDS. The Student Affairs Committee meetings, as reflected in its minutes, focused considerable attention on this issue; the court-ordered hearing also was directed primarily to this question. Despite assurances from petitioners and their counsel that the local group was in fact independent of the National organization, it is evident that President James was significantly influenced by his apprehension that there was a connection. Aware of the fact that some SDS chapters had been associated with disruptive and violent campus activity, he apparently considered that affiliation itself was sufficient justification for denying recognition.[12]

Although this precise issue has not come before the Court heretofore, the Court has consistently disapproved

[12] See n. 4, *supra,* for the complete text of the President's statement.

governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen's association with an unpopular organization. See, *e. g., United States* v. *Robel,* 389 U. S. 258 (1967); *Keyishian* v. *Board of Regents,* 385 U. S., at 605–610; *Elfbrandt* v. *Russell,* 384 U. S. 11 (1966); *Scales* v. *United States,* 367 U. S. 203 (1961). In these cases it has been established that "guilt by association alone, without [establishing] that an individual's association poses the threat feared by the Government," is an impermissible basis upon which to deny First Amendment rights. *United States* v. *Robel, supra,* at 265. The government has the burden of establishing a knowing affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims.[13]

Students for a Democratic Society, as conceded by the College and the lower courts, is loosely organized, having various factions and promoting a number of diverse social and political views, only some of which call for unlawful action.[14] Not only did petitioners proclaim their complete independence from this organization,[15] but they also

---

[13] In addition to the cases cited in the text above, see also *Law Students Civil Rights Research Council* v. *Wadmond,* 401 U. S. 154, 164–166 (1971); *In re Stolar,* 401 U. S. 23, 28 (1971); *Aptheker* v. *Secretary of State,* 378 U. S. 500 (1964); *Noto* v. *United States,* 367 U. S. 290, 299–300 (1961).

[14] See Hearings before a Subcommittee of the House Committee on Appropriations, 92d Cong., 2d Sess., pt. 1, p. 916 (1972), in which the former Director of the Federal Bureau of Investigation, J. Edgar Hoover, stated that while violent factions have spun off from SDS, its present leadership is "critical of bombing and violence."

[15] Petitioners asserted their independence both orally and in a written submission before the Student Affairs Committee. They restated their nonaffiliation in a formal statement filed prior to the court-ordered hearing. The only indication to the contrary is their unwillingness to eschew use of the SDS name altogether. But see n. 3, *supra.*

indicated that they shared only some of the beliefs its leaders have expressed.[16]   On this record it is clear that the relationship was not an adequate ground for the denial of recognition.

## B

Having concluded that petitioners were affiliated with, or at least retained an affinity for, National SDS, President James attributed what he believed to be the philosophy of that organization to the local group.   He characterized the petitioning group as adhering to "some of the major tenets of the national organization," including a philosophy of violence and disruption.[17]   Understandably, he found that philosophy abhorrent.   In an article signed by President James in an alumni periodical, and made a part of the record below, he announced his unwillingness to "sanction an organization that openly advocates the destruction of the very ideals and freedoms upon which the academic life is founded."   He further emphasized that the petitioners' "philosophies" were "counter to the official policy of the college."

The mere disagreement of the President with the group's philosophy affords no reason to deny it recognition.   As repugnant as these views may have been, especially to one with President James' responsibility, the mere expression of them would not justify the denial of First Amendment rights.   Whether petitioners did in fact advocate a philosophy of "destruction" thus becomes immaterial.   The College, acting here as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed

---

[16] Representatives of the group stated during the Student Affairs Committee meetings that they did not identify with all of the National's statements, but wished simply to "pick . . . certain ideas" from that organization.

[17] See n. 4, *supra.*

by any group to be abhorrent. As Mr. Justice Black put it most simply and clearly:

> "I do not believe that it can be too often repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish." *Communist Party* v. *SACB,* 367 U. S. 1, 137 (dissenting opinion) (1961).

## C

As the litigation progressed in the District Court, a third rationale for President James' decision—beyond the questions of affiliation and philosophy—began to emerge. His second statement, issued after the court-ordered hearing, indicates that he based rejection on a conclusion that this particular group would be a "disruptive influence at CCSC." This language was underscored in the second District Court opinion. In fact, the court concluded that the President had determined that CCSC-SDS' "prospective campus activities were likely to cause a disruptive influence at CCSC." 319 F. Supp., at 116.

If this reason, directed at the organization's activities rather than its philosophy, were factually supported by the record, this Court's prior decisions would provide a basis for considering the propriety of nonrecognition. The critical line heretofore drawn for determining the permissibility of regulation is the line between mere advocacy and advocacy "directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action." *Brandenburg* v. *Ohio,* 395 U. S. 444, 447 (1969) (unanimous *per curiam* opinion). See also *Scales* v. *United States,* 367 U. S., at 230–232; *Noto* v. *United States,* 367 U. S. 290, 298 (1961);

*Yates* v. *United States,* 354 U. S. 298 (1957). In the context of the "special characteristics of the school environment," [18] the power of the government to prohibit "lawless action" is not limited to acts of a criminal nature. Also prohibitable are actions which "materially and substantially disrupt the work and discipline of the school." *Tinker* v. *Des Moines Independent School District,* 393 U. S., at 513. Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.

The "Student Bill of Rights" at CCSC, upon which great emphasis was placed by the President, draws precisely this distinction between advocacy and action. It purports to impose no limitations on the right of college student organizations "to examine and discuss *all* questions of interest to them." (Emphasis supplied.) But it also states that students have no right (1) "to deprive others of the opportunity to speak or be heard," (2) "to invade the privacy of others," (3) "to damage the property of others," (4) "to disrupt the regular and essential operation of the college," or (5) "to interfere with the rights of others." [19] The line between permissible speech and impermissible conduct tracks the constitutional requirement, and if there were an evidential basis to support the conclusion that CCSC-SDS posed a substantial threat of material disruption in violation of that command the President's decision should be affirmed. [20]

---

[18] *Tinker* v. *Des Moines Independent School District,* 393 U. S. 503, 506 (1969).

[19] See n. 5, *supra.*

[20] It may not be sufficient merely to show the existence of a legitimate and substantial state interest. Where state action designed to regulate prohibitable action also restricts associational rights—as nonrecognition does—the State must demonstrate that the action

The record, however, offers no substantial basis for that conclusion. The only support for the view expressed by the President, other than the reputed affiliation with National SDS, is to be found in the ambivalent responses offered by the group's representatives at the Student Affairs Committee hearing, during which they stated that they did not know whether they might respond to "issues of violence" in the same manner that other SDS chapters had on other campuses. Nor would they state unequivocally that they could never "envision . . . interrupting a class." Whatever force these statements might be thought to have is largely dissipated by the following exchange between petitioners' counsel and the Dean of Student Affairs during the court-ordered hearing:

> Counsel: ". . . I just read the document that you're offering [minutes from Student Affairs Committee meeting] and I can't see that there's anything in it that intimates that these students contemplate any illegal or disruptive practice."
>
> Dean: "No. There's no question raised to that, counselor . . . ." App. 73–74.

Dean Judd's remark reaffirms, in accord with the full record, that there was no substantial evidence that these particular individuals acting together would con-

---

taken is reasonably related to protection of the State's interest and that "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States* v. *O'Brien,* 391 U. S. 367, 377 (1968). See also *NAACP* v. *Alabama ex rel. Flowers,* 377 U. S. 288 (1964); *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S. 539, 546 (1963); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449 (1958). On this record, absent a showing of any likelihood of disruption or unwillingness to recognize reasonable rules governing campus conduct, it is not necessary for us to decide whether denial of recognition is an appropriately related and narrow response.

stitute a disruptive force on campus. Therefore, insofar as nonrecognition flowed from such fears, it constituted little more than the sort of "undifferentiated fear or apprehension of disturbance [which] is not enough to overcome the right to freedom of expression." *Tinker* v. *Des Moines Independent School District,* 393 U. S., at 508.

## D

These same references in the record to the group's equivocation regarding how it might respond to "issues of violence" and whether it could ever "envision . . . interrupting a class," suggest a fourth possible reason why recognition might have been denied to these petitioners. These remarks might well have been read as announcing petitioners' unwillingness to be bound by reasonable school rules governing conduct. The College's Statement of Rights, Freedoms, and Responsibilities of Students contains, as we have seen, an explicit statement with respect to campus disruption. The regulation, carefully differentiating between advocacy and action, is a reasonable one, and petitioners have not questioned it directly.[21] Yet their statements raise considerable question whether they intend to abide by the prohibitions contained therein.[22]

---

[21] See n. 5, *supra.*

[22] The Court of Appeals found that petitioners "failed candidly to respond to inquiries whether they would resort to violence and disruption on the CCSC campus, including interruption of classes." 445 F. 2d, at 1131. While petitioners' statements may be read as intimating a rejection of reasonable regulations in advance, there is in fact substantial ambiguity on this point. The questions asked by members of the Student Affairs Committee do not appear to have been propounded with any clear distinction in mind between that which the petitioners might advocate and the conduct in which they might engage. Nor did the Student Affairs Committee attempt to obtain a clarification of the petitioners' ambiguous answers by

As we have already stated in Parts B and C, the critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not. Petitioners may, if they so choose, preach the propriety of amending or even doing away with any or all campus regulations. They may not, however, undertake to flout these rules. MR. JUSTICE BLACKMUN, at the time he was a circuit judge on the Eighth Circuit, stated:

> "We . . . hold that a college has the inherent power to promulgate rules and regulations; that it has the inherent power properly to discipline; that it has power appropriately to protect itself and its property; that it may expect that its students adhere to generally accepted standards of conduct." *Esteban* v. *Central Missouri State College,* 415 F. 2d 1077, 1089 (CA8 1969), cert. denied, 398 U. S. 965 (1970).

Just as in the community at large, reasonable regulations with respect to the time, the place, and the manner in which student groups conduct their speech-related

---

asking specifically whether the group was willing to abide by the Student Bill of Rights governing all campus organizations.

Moreover, this question was not among those referred by the District Court to the administrative hearing, and it was there addressed only tangentially. The group members who had made statements before the Student Affairs Committee did not testify, and their position was not clarified. Their counsel, whose tactics were characterized as "disruptive" by the Court of Appeals, elected to make argumentative statements rather than elicit relevant testimony. *Id.,* at 1126. Indeed, the District Court's failure to identify the question of willingness to abide by the College's rules and regulations as a significant subject of inquiry, coupled with the equivocation on the part of the group's representatives, lends support to our view that a remand is necessary.

activities must be respected.[23]  A college administration may impose a requirement, such as may have been imposed in this case, that a group seeking official recognition affirm in advance its willingness to adhere to reasonable campus law.  Such a requirement does not impose an impermissible condition on the students' associational rights.  Their freedom to speak out, to assemble, or to petition for changes in school rules is in no sense infringed.  It merely constitutes an agreement to conform with reasonable standards respecting conduct.  This is a minimal requirement, in the interest of the entire academic community, of any group seeking the privilege of official recognition.

Petitioners have not challenged in this litigation the procedural or substantive aspects of the College's requirements governing applications for official recognition. Although the record is unclear on this point, CCSC may have, among its requirements for recognition, a rule that prospective groups affirm that they intend to comply with reasonable campus regulations.  Upon remand it should first be determined whether the College recognition procedures contemplate any such requirement. If so, it should then be ascertained whether petitioners intend to comply.  Since we do not have the terms of a specific prior affirmation rule before us, we are not called on to decide whether any particular formulation would or would not prove constitutionally acceptable. Assuming the existence of a valid rule, however, we do conclude that the benefits of participation in the internal life of the college community may be denied to any

---

[23] See, e. g., *Adderley* v. *Florida,* 385 U. S. 39, 47–48 (1966); *Cox* v. *Louisiana,* 379 U. S. 536, 558 (1965); *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293, 297 (1961).

group that reserves the right to violate any valid campus rules with which it disagrees.[24]

## IV

We think the above discussion establishes the appropriate framework for consideration of petitioners' request for campus recognition. Because respondents failed to accord due recognition to First Amendment principles, the judgments below approving respondents' denial of recognition must be reversed. Since we cannot conclude from this record that petitioners were willing to abide by reasonable campus rules and regulations, we order the case remanded for reconsideration. We note, in so holding, that the wide latitude accorded by the Constitution to the freedoms of expression and association is not without its costs in terms of the risk to the maintenance of civility and an ordered society. Indeed, this latitude often has resulted, on the campus and elsewhere, in the infringement of the rights of others. Though we deplore the tendency of some to abuse the very constitutional privileges they invoke, and although the infringement of rights of others certainly should not be tolerated, we reaffirm this Court's dedication to the principles of the Bill of Rights upon which our vigorous and free society is founded.

*Reversed and remanded.*

---

[24] In addition to the College administration's broad rulemaking power to assure that the traditional academic atmosphere is safeguarded, it may also impose sanctions on those who violate the rules. We find, for instance, that the Student Affairs Committee's admonition to petitioners in this case suggests one permissible practice—recognition, once accorded, may be withdrawn or suspended if petitioners fail to respect campus law. See, *e. g., University of Southern Mississippi Chapter of Mississippi Civil Liberties Union* v. *University of Southern Mississippi,* 452 F. 2d 564 (CA5 1971); *American Civil Liberties Union* v. *Radford College,* 315 F. Supp. 893 (WD Va. 1970).

MR. CHIEF JUSTICE BURGER, concurring.

I am in agreement with what is said in the Court's opinion and I join in it. I do so because I read the basis of the remand as recognizing that student organizations seeking the privilege of official campus recognition must be willing to abide by valid rules of the institution applicable to all such organizations. This is a reasonable condition insofar as it calls for the disavowal of resort to force, disruption, and interference with the rights of others.

The District Judge was troubled by the lack of a comprehensive procedural scheme that would inform students of the steps to be taken to secure recognized standing, and by the lack of articulated criteria to be used in evaluating eligibility for recognition. It was for this reason, as I read the record, that he remanded the matter to the college for a factual inquiry and for a more orderly processing in a *de novo* hearing within the college administrative structure. It is within that structure and within the academic community that problems such as these should be resolved. The courts, state or federal, should be a last resort. Part of the educational experience of every college student should be an experience in responsible self-government and this must be a joint enterprise of students and faculty. It should not be imposed unilaterally from above, nor can the terms of the relationship be dictated by students. Here, in spite of the wisdom of the District Court in sending the case back to the college, the issue identified by the Court's opinion today was not adequately addressed in the hearing.

The relatively placid life of the college campus of the past has not prepared either administrators or students for their respective responsibilities in maintaining an atmosphere in which divergent views can be asserted

vigorously, but civilly, to the end that those who seek to be heard accord the same right to all others. The "Statement on Rights, Freedoms and Responsibilities of Students," sometimes called the "Student Bill of Rights," in effect on this campus, and not questioned by petitioners, reflected a rational adjustment of the competing interests. But it is impossible to know from the record in this case whether the student group was willing to acknowledge an obligation to abide by that "Bill of Rights."

Against this background, the action of the Court in remanding on this issue is appropriate.

MR. JUSTICE DOUGLAS.

While I join the opinion of the Court, I add a few words.

As Dr. Birenbaum* says, the status quo of the college or university is the governing body (trustees or overseers), administrative officers, who include caretakers, and the police, and the faculty. Those groups have well-defined or vaguely inferred values to perpetuate. The customary technique has been to conceive of the minds of students as receptacles for the information which the faculty have garnered over the years. Education is commonly thought of as the process of filling the receptacles with what the faculty in its wisdom deems fit and proper.

Many, inside and out of faculty circles, realize that one of the main problems of faculty members is their own re-education or re-orientation. Some have narrow specialties that are hardly relevant to modern times. History has passed others by, leaving them interesting relics of a bygone day. More often than not they represent those who withered under the pressures of McCarthyism or other forces of conformity and represent

---

*See the Appendix to this opinion.

but a timid replica of those who once brought distinction to the ideal of academic freedom.

The confrontation between them and the oncoming students has often been upsetting. The problem is not one of choosing sides. Students—who, by reason of the Twenty-sixth Amendment, become eligible to vote when 18 years of age—are adults who are members of the college or university community. Their interests and concerns are often quite different from those of the faculty. They often have values, views, and ideologies that are at war with the ones which the college has traditionally espoused or indoctrinated. When they ask for change, they, the students, speak in the tradition of Jefferson and Madison and the First Amendment.

The First Amendment does not authorize violence. But it does authorize advocacy, group activities, and espousal of change.

The present case is minuscule in the events of the 60's and 70's. But the fact that it has to come here for ultimate resolution indicates the sickness of our academic world, measured by First Amendment standards. Students as well as faculty are entitled to credentials in their search for truth. If we are to become an integrated, adult society, rather than a stubborn status quo opposed to change, students and faculties should have communal interests in which each age learns from the other. Without ferment of one kind or another, a college or university (like a federal agency or other human institution) becomes a useless appendage to a society which traditionally has reflected the spirit of rebellion.

## APPENDIX TO OPINION OF DOUGLAS, J.

"A compulsory ghetto fails as a community because its inhabitants lack the power to develop common goals and to pursue them effectively together. It fails too

because of a fatal disconnection between the possession and use of power and the cognition that knowledge, as a form of power, carries with it political responsibility. In these respects the campus is now like the compulsory ghetto.

"Those who deplore a view of the university in terms of its powerful political role in American society must account for the institution's use of political power in its own terms, for its own purposes. I have come to feel lately—partly, I guess, because of the legal reasoning styles to which I have been exposed—that those playing around with the structure of their universities these days are playing with tinker toys. New committees, new senates and new student-participation formulae do not necessarily mean that anything has changed. Indeed, if Berkeley, Columbia, Harvard and Chicago are valid examples, restructuring turns out to be one of the brilliant new inventions for sustaining the status quo. The vested interests and essential privileges involved in current efforts to restructure the university have yet completely to surface. A substantial part of our melting iceberg is still below the waterline.

"That part of the student critique of the university which most deserves our attention bears upon what we teach, how we teach it, and the terms on which it is taught. One of the interesting things their critique points out is that our building programs, corporate investments, relationships to the immediate community and to the society, and our views of citizenship inside the university, all turn out to be projections and applications of what *we* call or have called education. Their critique suggests the perfectly absurd conclusion that there is a relationship between their long hair and our long war, between being a nurse and being a Negro, between the freshman political-science course and the pollution of fresh air, between education for freedom and

being free. Obviously, the contemporary American student activist is crazy.

"We have probably made a mistake by revealing to our students that there really is too much to know, and only one way to learn it—our way. They have come to accept this as gospel, and it has encouraged them to view curriculum development as essentially a sophisticated art of selection, interpretation and emphasis in which *they* have a vested interest. Understanding this, naturally they have begun to ask the key political questions bearing upon *our* vested interests and privileges: What experience and talent should be empowered to select? Who should be empowered to employ those who will interpret, and to deploy the wealth required to support the enterprise?

"Obviously the control over who will be kept out and over punishment-and-reward systems inside is extremely important. While our students still generally concede that the older adults who teach them may know something they don't, they are also asserting the uniqueness of their own experience, claiming that they may know something which those now in charge don't. They have returned to the kindergarten level to rediscover a principle long revered in American education—that the student plays a positive and active role, that he has something definite and essential to contribute to his own education.

"The young—suspended precariously in a society obsessed by Vietnam violence, race violence, crime violence and culture violence—are restating the eternal questions about education: What is important to learn, and how may people best learn together? Regarding these enduring questions, they are also asking the eternal question of a society which officially encourages its young to grow up free (even while keeping them in bondage), namely: Who shall judge? Regarding the problems

these questions suggest, academic tradition responds through an uptight delineation of jurisdictions and powers within the university.

.          .          .          .          .

"Today's campus disruptions were born in the years 1776 to 1787.  Although the mind of Thomas Jefferson was anchored in the traditions of Heidelberg, Oxford, Paris, Bologna, Rome, Greece, the religions of the early Christians and the ancient Hebrews, minds like his transformed the old into something quite new, as in the case of his proposal for a university in Virginia.  What was created then was not, of course, the latest thing, nor was it necessarily the Truth.  But it was an adventure, a genuine new departure, unlike most of the institutions of· learning we have created in this country since the Morrill Act—that is, most of our higher-education establishment.

"The traditions of the university in the West are anti- if not counter-revolutionary.  Operating within these traditions, the university has produced revolutionary knowledge, but institutionally the uses of the knowledge have been directed mainly toward the confirmation of the status quo, particularly the political and cultural status quo.  The themes of peace, integration, equality, freedom and the humane uses of knowledge are ones which traditionally fall beyond the purview of the university.

"But in principle the main themes of our society run counter to this deployment of knowledge.  In spite of Vietnam, poverty, racism and the overbearing logic of our technology—in spite of Bedford-Stuyvesant—the main themes of our country, in principle, were and still are revolutionary.  They are reflected in such questions as these: Can the revolutionary knowledge developed in the universities be used humanely, to conform with what Jefferson and his colleagues apparently meant?  What

does equality mean, and whatever it meant or means, can we still achieve a version of it consistent with this adventure? Are reason and democracy really consistent? Is war in behalf of peace, given what we know now, realistic? Can Negroes who were once property suddenly become people? Are some genocides more decent than others, some cesspools more fragrant than others?

"In any event, I *know* that Bedford-Stuyvesant is crammed full of red-white-and-blue Americans. They really believe that we ought to practice what we preach, and that's the problem. We've oversold America to ourselves, and so many of my very good friends—looking at the street violence and the circuses in the courts and on the campuses—who believe we confront a deeply un-American phenomenon, who think we face a serious threat to American values, completely misread what is going on there. We face a vibrant, far-reaching reassertion of what this country claims, what it has always claimed it is." W. Birenbaum, Something For Everybody Is Not Enough 67–69, 248–249.

MR. JUSTICE REHNQUIST, concurring in the result.

While I do not subscribe to some of the language in the Court's opinion, I concur in the result that it reaches. As I understand the Court's holding, the case is sent back for reconsideration because respondents may not have made it sufficiently clear to petitioners that the decision as to recognition would be critically influenced by petitioners' willingness to agree in advance to abide by reasonable regulations promulgated by the college.

I find the implication clear from the Court's opinion that the constitutional limitations on the government's acting as administrator of a college differ from the limitations on the government's acting as sovereign to enforce its criminal laws. The Court's quotations from *Tinker*

v. *Des Moines Independent School District,* 393 U. S. 503, 506 (1969), to the effect that First Amendment rights must always be applied "in light of the special characteristics of the . . . environment," and from *Esteban* v. *Central Missouri State College,* 415 F. 2d 1077, 1089 (CA8 1969), to the effect that a college "may expect that its students adhere to generally accepted standards of conduct," emphasize this fact.

Cases such as *United Public Workers* v. *Mitchell,* 330 U. S. 75 (1947), and *Pickering* v. *Board of Education,* 391 U. S. 563 (1968), make it equally clear that the government in its capacity as employer also differs constitutionally from the government in its capacity as the sovereign executing criminal laws. The Court in *Pickering* said:

> "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U. S., at 568.

Because of these acknowledged distinctions of constitutional dimension based upon the role of the government, I have serious doubt as to whether cases dealing with the imposition of criminal sanctions, such as *Brandenburg* v. *Ohio,* 395 U. S. 444 (1969), *Scales* v. *United States,* 367 U. S. 203 (1961), and *Yates* v. *United States,* 354 U. S. 298 (1957), are properly applicable to this case dealing with the government as college administrator. I also doubt whether cases dealing with the prior restraint imposed by injunctive process of a court, such as *Near* v. *Minnesota,* 283 U. S. 697 (1931), are precisely comparable to this case, in which a typical sanction imposed was the requirement that the group abandon its plan to meet in the college coffee shop.

Prior cases dealing with First Amendment rights are not fungible goods, and I think the doctrine of these cases suggests two important distinctions. The government as employer or school administrator may impose upon employees and students reasonable regulations that would be impermissible if imposed by the government upon all citizens. And there can be a constitutional distinction between the infliction of criminal punishment, on the one hand, and the imposition of milder administrative or disciplinary sanctions, on the other, even though the same First Amendment interest is implicated by each.

Because some of the language used by the Court tends to obscure these distinctions, which I believe to be important, I concur only in the result.