LAKE PARK EDUCATION ASSOCIATION, Larry Stinson, Bruce Roberts, Judith Cappetto, Michael Kiser, John Pomatto, Attila Weninger and Laurence Dunn, individually and on behalf of all those similarly situated, Plaintiffs,

v.

BOARD OF EDUCATION OF LAKE PARK HIGH SCHOOL DISTRICT NO. 108, DU PAGE COUNTY, ILLINOIS; Raymond Foote, Samuel Vitale, Constance Hunsberger, Bernard Swiontek, Jr., Richard Shipman, Joseph Moran and Charles Hodgin, individually and as members of the aforesaid Board of Education; and Carl Forrester, individually and as Superintendent of Lake Park High School, Defendants.

No. 75 C 2856.

United States District Court, N. D. Illinois, E. D.

March 31, 1981.

Saul R. Wexler of Lawrence Jay Weiner & Assoc., Chicago, Ill., for plaintiff.

Ralph Miller, Chicago, Ill., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION

WILL, District Judge.

The Court, having reviewed the parties' cross motions for summary judgment, their respective statements of facts, and their various briefs in support of and in opposition to the cross summary judgment motions, makes the following narrative findings of fact and conclusions of law and enters its opinion.

### I. THE FACTS

The plaintiff, Lake Park Education Association (Association), was organized on March 25, 1975 with membership open to all certificated members of the faculty of Lake Park High School District No. 108 (District). It had previously existed between 1955 (when the District was organized) and some time in the 1960's when it was dissolved. It is affiliated with the Illinois Education Association (IEA) and the National Education Association (NEA).

The defendants are the Board of Education (Board) of Lake Park High School District No. 108, DuPage County, Illinois, and the individual members thereof during the period here involved. The defendant, Carl Forrester (Superintendent), was the Superintendent of the District from its formation in 1955 through the period here involved.

On March 26, 1975, a letter was mailed by the Association to the Superintendent advising him that the Association had been re-established. His reaction upon its receipt was that he "was disappointed," that "if the Union's existence meant that we had to operate differently, I didn't want any part of it and therefore, I didn't want it to occur."

Two days later, on March 27, 1975, the Superintendent convened a special meeting of the faculty Executive Council comprised of members of the administrative staff and so-called "ranking members" of the faculty who had some supervisory and administrative as well as teaching responsibilities and received additional compensation therefor. He stated to the group that he was "not pleased" that the Association had been re-established, that he considered it as a "personal attack" on him and that, if the Association was successful and a large number of the faculty joined it, "there probably would be no more differential staffing," since, in his opinion, a union and differential staffing were incompatible. The latter was a reference to a staffing structure established in 1968 under which teachers were designated and compensated at one of five levels on the basis of evaluations of their performance and the responsibilities assigned to them, irrespective of their teaching experience and educational degrees. The additional compensation ranged from $2,500 to $5,000 per annum. All of the teachers who were members of the Executive Council and present at the meeting received additional compensation and the abolishing of differentiated staffing might have resulted in their losing their additional compensation.

On April 10, 1975, consistent with past practices as to the use of school facilities by teacher groups and other public and private groups, the Association met on school premises and elected its officers. Upon hearing of the meeting, the Superintendent denied the Association the future use of any school facilities on any basis. Subsequently, the Board authorized such usage by the Association on condition that it pay the same charges as a commercial organization rather than be permitted to use the school facilities for meetings without charge as had its predecessor and as community service organizations are permitted to do. This was because the Board determined upon recommendation of the Superintendent that the Association was a "self-interest" group.

On April 10, 1975, the Superintendent convened another special Executive Council meeting at which he announced that he was ending differentiated staffing and dissolving the Faculty Senate because they were incompatible with union activities. At that meeting, Bruce Roberts, a member of the Executive Council and a plaintiff herein, was accused by Assistant Superintendent

Eugene Swierczewski (Assistant Superintendent) of being "a recruiter for the union."

On May 19, 1975, the Board met and Larry Stinson, the Association's president, appeared, made a general statement of the objectives of the Association and requested the use of school facilities for regular meetings of the Association without charge, as well as use of school duplicating facilities on a reimbursement basis as was customary with teachers and other organizations. The President of the Board, defendant Raymond Foote, first inquired if the names of the members of the Association were available but abandoned the question when asked the purpose of his inquiry. Thereafter, on June 4, 1975, the Board designated the Association as a "self-interest" group which would be charged commercial rates for use of school facilities for meetings but did not respond to the request as to the use of duplicating facilities on a reimbursement basis.

On June 9, both the Superintendent and Assistant Superintendent addressed a general faculty meeting. The Superintendent stated that the Association was "anathema" and that the entire differentiated staffing system had been abolished because, in his words, "the staff had chosen a union to replace it." The Assistant Superintendent announced that all teachers would have their teaching loads increased, and that, in his opinion the school had "21 too many teachers." At the time, the projections were that more teachers would be needed because of area population increases, the Board had surplus funds and the North Central Accreditation Association's study indicated that additional teachers were needed and additional teachers were subsequently employed.

On June 10, 1975, the Superintendent convened a meeting with certain faculty members whom he was considering as replacements for those who had received additional responsibility and compensation under the abolished differentiated staffing system. A new designation of "supervisor" was created although the individuals were to perform the same functions as the designated teachers under differentiated staffing. At that meeting, the Superintendent stated in effect that one could not be a supervisor and a member of the Association. Those present were given five days in which to choose. Not invited to the meeting nor given the opportunity to continue as a supervisor was Bruce Roberts, the then ranking member of the English Department who had 14 years on the faculty and an "excellent" appraisal but who had been accused by the Assistant Superintendent at the April 10 meeting of being a union recruiter.

During the same period, the Superintendent had private conversations with a number of faculty members. One of those, Thor Connally, resigned from the Association, the IEA and the NEA on May 16, 1975, after his conference with the Superintendent and sent a copy of his letters of resignation to the Superintendent. He subsequently was offered and accepted a new position designated as "coordinator," a position subordinate to the new position of "supervisor." Another member, Susan D. Madorin, was offered and accepted a position of supervisor and terminated her membership in the Association.

Plaintiff, Judith Cappetto, had a conversation about the situation with Ms. Madorin, who suggested that she talk privately with the Superintendent. Ms. Cappetto did not do so, but on June 15, 1975, the last day the Superintendent had given faculty members on which to choose, she was contacted by the Assistant Superintendent who asked if she had understood the Superintendent's agreement or invitation. She responded that, if she understood it correctly, she had to give up her membership in the Association in order to be eligible to be a supervisor. The Assistant Superintendent responded that she understood correctly and she said, "Then, I'm sorry."

Other members of the Association had comparable experiences. Two days after the June 10 meeting, on June 12, Richard Canova resigned from the Association and

was subsequently designated a supervisor. Several new teachers designated as supervisors were employed from outside the district; other teachers with less seniority than some Association members were designated as supervisors; finally, no Association member was named a supervisor.

In August and September 1975, members of the Association were told that they were prohibited from talking to each other about Association business on the school premises between 7:15 a. m. and 3:15 p. m. (except during lunch hour) even when no students were on the premises; were reprimanded for placing a memorandum relating to this suit in the teachers' mailboxes, a previously permitted practice, and for being suspected of talking to each other on the telephone about Association activities. Some members were deprived of sources of additional employment and income they had previously enjoyed, e. g., Bruce Roberts, one month's summer employment, and Stinson, the Association president, the position of Driver Education Supervisor which he had held the preceding three years.

During the 1975–76 school year, the new supervisors and coordinators were paid additional compensation although there were no job descriptions delineating their responsibilities; there was no procedure or system for evaluating the 114 teachers employed by the District and not one supervisor prepared a written evaluation of any teacher but all spent most of their time as teachers as had the previous ranking members and department chairmen. In fact, as late as December 1976, the Board had not adopted job descriptions for supervisors and coordinators.

It has been stipulated that the abolition of the differentiated staffing system and the creation of new titles such as "coordinator" and "supervisor" were in reaction to the re-establishment of the Association.

While there are other secondary facts cited in the briefs of both parties, the foregoing are those relevant to the issues involved herein.

## II. THE ISSUES

Plaintiffs contend first, and defendants do not disagree, that teachers like all other persons, have the right of free association and that members of a labor union may not be discriminated against or denied equal treatment because of their membership. *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *McLaughlin v. Tilendis,* 398 F.2d 287 (7th Cir. 1968).

Plaintiffs further contend, and again defendants do not disagree, that the state may inhibit, impair or prohibit exercise of the constitutional rights of association and free speech only upon a showing that an overriding and compelling legitimate state interest so requires. *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960); *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Court said:

> "[I]t is the government's burden to demonstrate an overriding interest in order to validate an encroachment on protected interests, the burden of establishing this justification ... will rest on the [government] .... cases of doubt being resolved in favor of the particular [employee]." 427 U.S. at 368, 96 S.Ct. at 2687.

Plaintiffs urge that it is clear from the record that defendants embarked on a course of conduct designed to discourage membership in the Association, particularly by senior members of the faculty who had been given administrative responsibilities in addition to their normal teaching duties and for which they received additional compensation. The methodology chosen was to eliminate the practice of differentiated staffing and to substitute therefor new titles of supervisor and coordinator and then limit persons appointed to the position of supervisor to teachers who were not mem-

bers of the Association.[1] This was on the expressed ground that the teachers given the new title of supervisor were part of "management" and membership in the union was incompatible with their management positions.

The plaintiffs contend and the record confirms that the teachers holding the new titles and positions performed functions similar to those performed by the so-called ranking members, Level I teachers and department heads under differentiated staffing. They performed none of the functions, nor discharged any of the responsibilities, customarily handled by school administrators. At most, they, like their predecessors, served as advisors without any authority to determine employment, transfer, promotion, dismissal, performance evaluation or salaries.

Second, they point out that the teachers classified as coordinators or supervisors do not possess certification as either administrators or supervisors under the School Code of Illinois which certification is required of all administrative or supervisory school officers. (Ill.Rev.Stat., ch. 122, § 21–7.1).

Third, plaintiffs point out that the School Code of Illinois specifically vests school administration and supervision of personnel in the superintendents and principals. (Ill. Rev.Stat., ch. 122, §§ 10–21.4 and 10–21.4a).

Fourth, they also point out that under the Illinois School Code the responsibility of appointing, transferring, terminating and setting the compensation of teachers is vested exclusively with the particular Board of Education and cannot be delegated although the Superintendent normally recommends action to the Board. *Illinois Education Ass'n v. Board of Education*, 62 Ill.2d 127, 340 N.E.2d 7 (1976); *Board of Education v. Rockford Education Ass'n*, 3 Ill. App.3d 1090, 280 N.E.2d 286 (1972).

Fifth, plaintiffs assert, and defendants apparently agree, that neither the so-called coordinators or supervisors qualify as administrators or supervisors under the School Code of Illinois or as that term is commonly understood in labor relations.

Sixth, plaintiffs point out that the Superintendent admittedly abolished the system of differentiated staffing in reaction to the re-establishment of the Association without substituting any replacement system and that during the entire 1975–76 school year no comparable staffing system had been approved by the Board or existed at the Schools.

Seventh, plaintiffs allege that the various acts of the defendants, including the refusal to designate any Association members as supervisors, except the designation of members who resigned from the Association; the initial refusal to permit meetings to be held on school premises; the denial of the use of other facilities such as duplicating equipment on a reimbursement basis; the prohibitions against members communicating with each other during school hours (except lunch) even when no students were present; the prohibition against utilization of the teachers' mailboxes for notices; the reprimands; the deprivation of fringe benefits of some members of the Association such as Roberts and Stinson; the statements regarding staff reductions, increased teacher loads, etc., all constituted impermissible interference with plaintiffs' constitutional rights under the First Amendment.

Finally, plaintiffs assert that while the Superintendent and Assistant Superintendent contend that membership in the Association is inconsistent with appointment as supervisors, positions which they acknowledge do not require state certification as school administrators or supervisors, both continue to be members of the NEA, the national affiliate of the Association, and find no "inconsistency" therein.

In light of the foregoing, plaintiffs urge that they have established discrimination which could and did significantly deter their freedom of association and freedom of speech. *See Madison School District v. Wisconsin Employment Relations Comm'n*, 429

---

1. Ten of the sixteen coordinators appointed for the 1975–76 school year also were not members of the Association although well over half of the total teaching staff were members.

U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976); *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Police Department of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Accordingly, they ask that summary judgment be entered in their favor.

Defendants, on the other hand, characterize the Association as a union which seeks recognition as bargaining agent for the teachers in the hope of increasing their compensation and reducing their workload, as well as negotiating with respect to other conditions of teachers' employment including a salary schedule, the merit system and differentiated staffing. They suggest that the Association might even engage in an illegal strike. They point out that the Board in 1974 adopted certain policies with respect to employees' conduct. One provides—

"No employee of the Board shall engage in or have a financial interest, directly or indirectly, in any activity that conflicts or raises a reasonable question of conflict with his duties and responsibilities in the school system; nor shall any employee engage in any type of private business during school time or on school property."

Another provides—

"A certificated staff member shall have the freedom to join, or not to join, any teacher organization or professional association. His membership dues in such organization shall be his individual responsibility.

"The use of school facilities by professional organizations—local, state, national, or other—shall be subject to the Board's policy and administrative regulations on public use of school facilities."

They also refer to a memorandum issued by the Superintendent on August 28, 1975 in which he entreated "each candidate for a supervisor's position or a coordinator's position to give careful consideration to the duties and responsibilities to be undertaken in the acceptance of a contract for one of the aforementioned positions" and "not to accept a supervisor's position unless he/she is able to be loyal to a management perspective in executing the responsibilities implied in the contract."

He went on to add that "no effort will be made to restrict a supervisor or a coordinator from holding membership in any teachers' union or other such group he/she chooses to join" but that whether "a particular supervisor's or coordinator's contract is to be issued from year to year will be determined by the policies of the Board of Education ... and the staffing patterns relating thereto and will be determined on the basis of the performance of the particular supervisor or coordinator in exercising his/her responsibilities as appraised by members of the administrative staff." He added, "Whether a particular supervisor's or coordinator's contract is to be issued from year to year will not be based on whether the supervisor or coordinator holds membership in any particular organization."

Based on the foregoing and the depositions of several teachers that they were not pressured by the Superintendent or Assistant Superintendent into either resigning from or not joining the Association, defendants contend that plaintiffs have failed to establish that any of their constitutionally protected rights have been violated. Specifically, they assert that plaintiffs have not been discriminated against because of their membership in the Association and that all of the defendants' actions alleged by plaintiffs to have infringed upon their First Amendment rights of free speech and freedom of association were proper exercises of defendants' authority.

As is apparent from the foregoing, the defendants contend that each of their various actions were proper while plaintiffs contend that taken together they constituted a course of conduct intended to discourage and intimidate teachers from associating together (joining the Association) or speaking freely (about the Association, the administration of the District, etc.) and thereby deprived them of constitutionally protected rights.

Given the sequence of events, and taking all the actions together, the conclusion is

inescapable that the Superintendent and the other defendants embarked on a course of conduct intended to discourage and inhibit teachers from exercising their constitutional rights of freedom of association and speech. Nor is there any evidence of an overriding, compelling, legitimate, public interest justifying the attempt to prevent the re-establishment of the Association, excluding members from positions as so-called supervisors or otherwise discriminating against members or the Association in permitting them to communicate with each other at times and under circumstances which could in no way interfere with their teaching and other responsibilities. It is difficult on the record to determine if charging the Association for use of school facilities in which to hold meetings or denying to members use of reproduction equipment on a reimbursable basis is discriminatory but it certainly is bad employer-employee relations and the kind of petty tactics which one is surprised to find resorted to by community leaders. The same is true of reprimanding a teacher for using a school typewriter to type up the minutes of an Association meeting as the Assistant Superintendent did.

It is difficult to draw any inference from defendants' conduct other than that they intended to make clear their opposition to teachers associating together in a union for purposes of negotiating terms and conditions of their employment. The Superintendent and Assistant Superintendent explicitly stated their opposition on more than one occasion. Even defendants' briefs surprisingly contain various anti-union and anti-teacher references. Their argument opens with a quotation from *Taylor v. Board of Education*, 191 F.Supp. 181 (S.D. N.Y.1961), aff'd, 294 F.2d 36 (2d Cir. 1961), which states that the school board "is a public body charged with a public responsi-

bility" which must be exercised "solely in the best interests of the children attending the schools." 191 F.Supp. at 197. From this the defendants conclude that the Board has no "duty to serve the best interests of the teachers or the unions." [2]

The next paragraph of the argument quotes an ad hominum from a recently published pamphlet of the Chamber of Commerce of the United States entitled "Everything You've Ever Wanted to Know About Unions But Were Afraid to Ask" to the effect that a union is "an organization designed to further particular economic, political and social goals deemed important by its leaders."

After other unfavorable comments about unions and union members such as that the Superintendent was accurate in his statement that "a union was anathema to differentiated staffing" as demonstrated by the "union dogma" and references to the "disgruntled plaintiff union members," it goes on to say that the Superintendent, "apparently well aware of the twisted construction which the union sought to place upon his language issued a formal, written statement reflective of the new organizational structure and the duties and hoped for attitudes of persons who would be filling the new positions." This was the statement of August 28, 1975, previously referred to, which confirmed that supervisors would be required to be "loyal to a management perspective" and that renewal of either a supervisor or coordinator's designation would "be determined on the basis of the performance of the particular supervisor or coordinator in exercising his/her responsibilities as appraised by members of the administrative staff."

Taken with the fact that no member of the Association was designated to hold any of the eleven supervisor positions and only six of sixteen coordinators were originally

---

**2.** It is interesting to note that the court in *Taylor* went on to hold that the Board of Education had violated plaintiffs' constitutional rights and, in the course of so doing, added observations which are particularly applicable to this case:

"Constitutional rights are determined by realities, not by labels or semantics. The Supreme Court has affirmed that courts must look through the guise in which school officials seek to clothe their unconstitutional conduct."
191 F.Supp. at 194.

members of the Association, it is not surprising that teachers concluded that membership in the Association would prejudice, if not preclude, their designation to these positions. Add to this the denial of extra duty and compensation such as summer employment and Driver Education Supervisor appointment, as well as the other actions previously referred to, and it becomes obvious that the statement of August 28, 1975 could hardly have allayed the fears of any teacher that membership in the Association would be disadvantageous, a conclusion which the defendants clearly wanted teachers to reach.

Finally, in their reply brief the defendants suggest that "the underlying and philosophical question is whether a public school board mindful of its dual obligation to educate its pupils and safeguard its taxpayers' dollars, must clutch an adder to its breast in the form of a supervisor who is an avowed and militant unionist."

The only two limitations of a teacher's First Amendment rights are that the exercise of those rights cannot be "so disruptive as to impede the teacher's performance or to interfere with the operation of the school . . ." and must involve matters of public interest. *McGill v. Board of Education of Pekin Elementary School*, 602 F.2d 774, 777 (7th Cir. 1979). Since the defendants have not shown that the Association's activities were disruptive and since the Association's activities were of public interest, we conclude then that, absent any showing of compelling, legitimate public interest,[3] there is no justification for defendants' conduct. Plaintiffs' motion for summary judgment is granted and defendants' motion is denied. There remains the question of relief and a hearing will be scheduled to determine what relief will be appropriate.

3. Unless one assumes that preventing public employees from joining a union is a compelling, legitimate public interest, as defendants apparently do, there is no other interest sought to be served. The right of public employees to or-

ganize and bargain over the terms and conditions of their employment has long been recognized. *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).