ROBERT HARRELL, Plaintiff-Appellant, *v.* SOUTHERN ILLINOIS UNIVERSITY *et al*, Defendants-Appellees—(Lisa Haines, Intervening Plaintiff-Appellant).

Fifth District   No. 83—112

Opinion filed November 14, 1983.

John R. Clemons, State's Attorney, of Murphysboro, and H. Carl Runge,

Jr., and Sue Sachtleben, both of Runge & Gumble, P.C., of Collinsville, for appellant Robert Harrell.

H. Carl Runge, Jr., and Sue Sachtleben, both of Runge & Gumble, P.C., of Collinsville, for appellant Lisa Haines.

Shari Rhode and Thomas P. Polityka, both of Southern Illinois University, of Carbondale, for appellees.

JUSTICE KARNS delivered the opinion of the court:

Appellants, Robert Harrell, a political candidate, and Lisa Haines, a student, appeal from the judgment of the circuit court of Jackson County denying appellants injunctive relief from enforcement of Southern Illinois University at Carbondale (SIU-C) Housing Procedure 1304, which establishes the period during which political candidates may canvass door-to-door in university housing. Harrell and Haines argue that enforcement of 1304 is an impermissible infringement of their rights of free expression and association guaranteed by the first amendment (U.S. Const., amend. I). In his capacity as county clerk, Harrell appeals from that portion of the judgment which found voter registrars to be exempt from procedure 1304 and enjoined SIU-C from barring their registration efforts in university housing during a period of 60 to 28 days immediately preceding an election. He contends that any university restrictions on solicitation in university housing are in conflict with the State's policy of facilitating voter registration.

Five thousand students live in University Housing at SIU-C. They are grouped according to their marital status. Married students live in apartments with private entrances. They do not have a common dining or recreational facility. Generally, single students live two to a room in residence halls, three of which are high rise buildings containing 1,200 rooms. Rooms in single-student housing are arranged along common hallways, every two rooms sharing a bathroom. In some residences single students share community bathrooms. The main access to high-rise buildings is the front door, which is unlocked from 7 a.m. to 11 p.m. From 3 p.m. until 11 p.m. a desk clerk supervises activities in the common areas and provides information or help to those who request it. After 11 p.m. the door is locked and a guard is on duty. In other residence halls the doors are locked 24 hours a day. All residents of single-student housing have round-the-clock access to their building and rooms by showing proper identification. They are permitted to invite guests to their rooms whenever they wish.

Dining facilities, administrative offices, the mail room, snack bar and recreational facilities are located in buildings adjacent to the dormitories. These buildings are open seven days a week from 8:30 a.m. to 1 a.m. whenever the university is in session. Under the university's general solicitation policy, registrars will be provided tables and chairs in the public areas upon their request. They may register voters during any period when these buildings are open and the Election Code permits registration. In family housing where there are no such common areas, registrars are permitted door-to-door access during reasonable hours. At no time may registrars solicit door-to-door in single-student housing.

In October 1976, SIU-C adopted Housing Procedure 1304 to govern door-to-door canvassing by political candidates of students living in both single-student and married housing. The procedure was amended in 1982, but the provisions at issue here were not substantially changed.

The University described the adoption of procedure 1304 as an effort "to delineate acceptable methods by which *** contact [between political candidates and students living in university housing] can be made without violating the rights of the student residents to accept or refuse." Those in charge of University Housing were expected to exercise care "to insure that student residents do not become a captive audience for any political group, but have the opportunity to participate in political solicitation if they desire." In addition to protecting student privacy and freedom to participate in political solicitation, the directors of University Housing were to establish rules "to provide fair and equitable political canvassing opportunities for all candidates for public office in any specific election."

The "Implementing Procedures" permitted candidates and their representatives to canvass door-to-door to single-student housing only during "the 30-day period (Monday through Friday, 6:00 p.m. to 10:00 p.m. —Saturday and Sunday excluded) immediately before a primary or regular election." In family housing canvassers could operate in the same periods "during reasonable hours." All candidates were automatically entitled to the required canvassing permit, and their representatives were granted permits upon request. Area student governments were allowed to sponsor meetings with candidates or their representatives at any time. Candidates and representatives could attend such meetings without a canvassing permit. Political advertisements were restricted to "the bulletin boards of the commons building in each of the housing areas desired."

In 1982, Harrell, then seeking reelection to the office of county

clerk, was evicted from university housing for canvassing door-to-door in a residence for single students before the 30-day period. At the time he was evicted, Harrell had the required canvassing permit. As the incumbent county clerk, Harrell was also county registrar in "full charge and control of the registration of voters ***." Ill. Rev. Stat. 1981, ch. 46, par. 4—4.

On September 24, 1982, following his expulsion from university housing, Harrell filed his complaint seeking equitable relief from the enforcement of procedure 1304 because it (1) unreasonably restricted the efforts of registrars to register single students as voters and thereby deprived the single students of "their right of free association" and "rights and privileges relating to registration to vote," (2) "[l]imit[ed] the fundamental right to vote of the single student without a showing of a compelling governmental interest," and (3) "[a]rbitrarily denie[d] equal access by deputy registrars to the single student voter in University housing which access is afforded all other persons." Harrell also complained that deputy registrars were improperly prevented from contacting single students because 1304 did not permit access until 30 days before the election and Illinois law prohibited registration within 28 days of an election (Ill. Rev. Stat. 1981, ch. 46, par. 4—6), thus limiting a registrar's effective solicitation of students in university housing to two days. In 1982, one of those two days was Sunday on which no access was permitted, so that registrars had only one day to canvass door-to-door in the dormitories. After argument by attorneys representing SIU-C and Harrell, both as county clerk and political candidate, the court granted a temporary restraining order barring SIU-C from restricting the activity of the registrars in university housing. The court limited the canvassing by registrars to the hours of 10 a.m. to 10 p.m. from September 25, 1982, to October 5. Denying Harrell's request that he, as a candidate, be freed from the constraints of procedure 1304, the court set the matter for a full hearing on October 5, 1982.

On October 4, 1982, Lisa Haines, a student at SIU-C, identifying herself as a potential voter in Jackson County, petitioned to intervene and filed her complaint alleging that application of procedure 1304 to registrars and candidates infringed her right to vote and to associate freely with political representatives. There is no evidence in the record that Haines testified or presented evidence in support of her allegations. Responding to the joint complaint, SIU-C admitted that its policy was to evict candidates violating procedure 1304 but denied all other allegations, specifically denying that 1304 applied to registrars.

On October 26, 1983, the trial court heard argument and received

evidence on the issue of whether SIU-C should be permanently enjoined from enforcing procedure 1304 and from barring registrars from door-to-door solicitation in university housing. Samuel Rinella, director of housing at SIU-C, was the only witness at the October 26 hearing. The court denied each side's motion for directed verdict. In its order of November 17, 1982, the court found that 1304 did not apply to registrars and deputy registrars and that allowing them access to students would "not unnecessarily affect or disturb university policy or substantially interfere with the opportunity of other students to obtain an education." The university was therefore ordered to permit registrars access to university housing during the "period from 45 days to 28 days immediately preceding the election." Finding that 1304 restricted the plaintiffs' constitutional rights, the court nevertheless denied their request for a permanent injunction against the enforcement of 1304. Denial was based on the finding that in light of the nature of university housing, procedure 1304 was "a reasonable restraint based on the time, manner and place of the First Amendment activity in question and [was] not a regulation of the content of speech."

On December 16, 1982, the appellants moved the court to reconsider its order of November 17, 1982. Appellants urged the court to recognize that it had erred in proceeding to the issue of the reasonableness of procedure 1304 before the university had carried its burden of providing that the housing regulation was necessary to protect a compelling State interest and was the least restrictive means of protection. The same argument was made in urging the court to reconsider the propriety of its findings "that place any restrictions on registrars or deputy registrars." After reviewing memoranda submitted by counsel and hearing argument, the court denied the motion to reconsider but modified the permanent injunction to require SIU-C to allow registrars to solicit door-to-door during a period 60 days to 28 days before an election.

On February 14, 1983, Harrell and Haines appealed from the trial court's denial of a permanent injunction against the enforcement of procedure 1304 and from the denial of the appellants' motion to reconsider that decision as they pertain to Harrell as a political candidate and to Haines. Harrell, as county clerk, filed a separate notice of appeal on February 17, 1983, in which he sought relief from a permanent injunction giving registrars access to single student housing only during the period between 60 and 28 days prior to an election.

The appeal by Harrell and Haines asks us to decide whether it was error for the trial court to decide that 1304 was a permissible re-

striction on appellants' rights of free speech and association because it was a reasonable restraint on the time, manner, and place of political activity based on the special nature of university housing. We affirm.

Harrell phrases his second appeal as a request for a permanent injunction barring SIU-C from interfering with registrar activity in university housing "in any manner or way." We read this as a request to modify the permanent injunction below. We affirm.

Although Haines did not testify or offer evidence to show she was prevented from associating or speaking with Harrell, we will assume the trial court correctly found that 1304 restricts "students' First Amendment right to speech, [and] the candidates' First Amendment right to speech and to association." We therefore recognize that SIU-C's procedure 1304 must withstand strict scrutiny. It must be the least restrictive method by which the University protects a compelling interest. We believe SIU-C's procedure 1304 passes this test.

■■■ The United States Constitution does not require that everyone have "an absolute *** right to use all parts of a school building or its immediate environs for his unlimited expressive purposes." (*Grayned v. City of Rockford* (1972), 408 U.S. 104, 117-18, 33 L. Ed. 2d 222, 233, 92 S. Ct. 2294, 2304.) In *Grayned*, the court recognized that a public school system had a "compelling interest in having an undisrupted school session conducive to the students' learning ***" (408 U.S. 104, 119, 33 L. Ed. 2d 222, 234, 92 S. Ct. 2294, 2305), and could therefore enforce an anti-noise statute against political expression which diverted students from the normal school activities (408 U.S. 104, 33 L. Ed. 2d 222, 92 S. Ct. 2294). Even "pure speech" may be restricted by public schools if it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." (*Tinker v. Des Moines Independent Community School District* (1969), 393 U.S. 503, 513, 21 L. Ed. 2d 731, 741, 89 S. Ct. 733, 740.) Colleges also have a legitimate interest in preventing campus disruptions. (*Healy v. James* (1972), 408 U.S. 169, 33 L. Ed. 2d 266, 92 S. Ct. 2338.) Universities have the "right to exclude even First Amendment activities that *** substantially interfere with the opportunity of other students to obtain an education." *Widmar v. Vincent* (1981), 454 U.S. 263, 277, 70 L. Ed. 2d 440, 452, 102 S. Ct. 269, 278..

Appellants protest strongly that the university has failed to provide so much as a "scintilla of evidence" of a compelling interest. At trial, appellants charged that the university had "not put anybody on in this proceeding that explains why deputy registrars need to be restricted, why canvassers need to be restricted in these dormitories."

Counsel for SIU-C tried repeatedly to elicit from housing director Rinella the reasons for procedure 1304, but appellants' counsel was sustained in its objections that such testimony was irrelevant. Nevertheless, as appellants point out, "[t]he background" of 1304 is presented in the housing procedure itself, copies of which were offered into evidence by both parties.

Housing director Rinella's testimony is rich with evidence to support the university's argument that it has a strong interest in "preserv[ing] the educational atmosphere of the dorms." The university provides housing for 5,000 young people, a large number of whom are freshmen and sophomores required to live in approved housing. These students live in 18 buildings, some of which are quite large and others somewhat removed from the center of campus. Most students live in close quarters, often studying, sleeping and dressing in the same room. Such circumstances naturally require supervision and regulation to promote order and quiet.

The university controls access to and use of these buildings with a number of regulations, including 1304. At night, doors are locked and guards are posted at entrances to monitor traffic into the buildings. In the afternoons, desk clerks are available to supervise the lobbies and provide assistance. Guests are permitted in the building only at the invitation of residents. Dining, lounge and recreation areas are centralized away from individual living and study areas. Nonpolitical solicitation is permitted only in the well-trafficked areas. Members of the housing staff are on duty 24 hours a day and are authorized to ask for identification in order to prevent unsponsored persons from being in the dormitories. All of these provisions evince the university's interest in creating and maintaining a situation in which students might pursue their education undisturbed. Housing Procedure 1304 dovetails with these provisions. Procedure 1304 was intended to protect individual privacy and prevent students in university housing from being "a captive audience for any political group." It does so by preventing the distraction and invasion of privacy necessarily attendant on unrestrained campaigning by political candidates knocking on door after door.

It is not enough, however, that SIU-C show that procedure 1304 protects a compelling interest. A regulation which restricts first amendment rights must be drawn as narrowly as possible to serve the university's purpose. (*Heffron v. International Society for Krishna Consciousness, Inc.* (1981), 452 U.S. 640, 69 L. Ed. 2d 298, 101 S. Ct. 2559; *Grayned v. City of Rockford* (1972), 408 U.S. 104, 33 L. Ed. 2d 222, 92 S. Ct. 2294.) This requirement may be satisfied if the univer-

sity can show that 1304 is appropriate and reasonable (*Healy v. James* (1972), 408 U.S. 169, 33 L. Ed. 2d 266, 92 S. Ct. 2338), as well as "content-neutral." (*Widmar v. Vincent* (1981), 454 U.S. 263, 277, 70 L. Ed. 2d 440, 452, 102 S. Ct. 269, 278.) Reasonableness must be determined in light of the "normal activities" of the building where the restriction is in effect. *Grayned v. City of Rockford* (1972), 408 U.S. 104, 116, 33 L. Ed. 2d 222, 232, 92 S. Ct. 2294, 2303.

■ Procedure 1034 places a few limits on the exchange of political views as are consonant with preservation of student privacy and study conditions. Limiting only the time, place and manner of campaigning, 1304 is at no time an absolute bar to a candidate's activities in the dormitories as was disapproved in *James v. Nelson* (N.D. Ill. 1972), 349 F. Supp. 1061. A student is always free to join in group meetings in the common areas or to invite the candidate to his room. Candidates may carry on their activities in the common areas of dormitories as well as in other campus buildings under the general solicitation policy which allows them access from 8:30 a.m. to 1 a.m. every day that the university is in session. A candidate is prevented only from choosing to inject himself into the normal activities of the dormitory rooms. During the 30 days before an election, the restriction is reduced even further to allow candidates to initiate door-to-door canvassing from 6 p.m. to 10 p.m. in the single students' residences and at reasonable hours in the married students' apartments. The greater leeway granted in approaching married students corresponds to the greater privacy they have in apartments which may be entered directly from the outside rather than from a hallway lined with bedrooms. In view of the normal activities of university dormitories, including sleeping, dressing, and studying, and the high density of the student population in those dormitories, we think procedure 1304 is reasonable and appropriate.

Appellants allege that the university has not availed itself of the less restrictive alternative of providing "no solicitation" signs to students so they could indicate their wishes at their doorways. This device, while not enlarging the students' freedom of choice, would allow candidates to range through the dormitories in search of willing voters without regard to the normal activities of the dormitory. It would not provide the protection afforded by 1304.

■ Enforcement of 1304 does not depend on the content of a candidate's message or on a student's political choices. It is designed to ensure "that the student residents have an opportunity to participate or not *as they desire*' and to provide fair and equitable political canvassing opportunities for *all* candidates ***." (Emphasis added.) Appel-

lants have offered no evidence that 1304 was enforced in a manner which discriminated on the basis of a candidate's views. We believe 1304 is "content-neutral" as required by law.

Turning now to Harrell's appeal as county clerk, we first note that the omission of the second notice of appeal from the appellants' brief occasioned some uncertainty about his position. However, we now understand him to argue that voter registrars should have completely unfettered access to students living in university housing. It has not been made clear to us how the disruption by roaming registrars would be less than that of campaigning candidates, nor indeed how one would distinguish the purpose behind such disruption when a candidate was also a registrar. Appellants have provided us with no authority or argument for the proposition that registration of voters is entitled to greater protection than freedom of speech and association which may be subject to reasonable time, place, and manner restraints. (*Widmar v. Vincent* (1981), 454 U.S. 263, 70 L. Ed. 2d 440, 102 S. Ct. 269; *Grayned v. City of Rockford* (1972), 408 U.S. 104, 33 L. Ed. 2d 222, 92 S. Ct. 2294.) Illinois law provides no license for voter registrars to disregard such reasonable regulations promulgated by SIU-C.

■ As county clerk, Harrell was given "full charge and control of the registration of voters within [his] county" by the Election Code. (Ill. Rev. Stat. 1981, ch. 46, par. 4—4.) However, his choice of the manner in which registration was to be carried out was not limitless. We do not think the legislature contemplated a round-the-clock, door-to-door effort as necessary to carry out the policy of registering all qualified voters. (Ill. Const. 1970, art. III, sec. 4.) The Election Code specified both the days and hours at which registration could take place in the county clerk's office, conforming in general to regular business hours of 9 a.m. to 5 p.m. and Saturday until noon. The clerk could, at his discretion, extend the Saturday hours, but any action by the county board with regard to hours superseded his discretion. Ill. Rev. Stat. 1981, ch. 46, par. 4—6.

In counties of less than 1,000,000 population, the clerk was required to provide one or more alternate methods of registration (Ill. Rev. Stat. 1981, ch. 46, par. 4—6.1.) If he chose to have a precinct registration, the county board was entitled to appoint the place of registry in the precinct, choosing a "place or places *** in the most public, orderly and convenient portions thereof ***." (Ill. Rev. Stat. 1981, ch. 46, par. 4—3.) Such places were to "be opened at noon and remain open until 9:00 P.M." and the public notified of the dates, hours and places of registration. (Ill. Rev. Stat. 1981, ch. 46, par. 4—

7.) If he preferred to "establish temporary places of registration" in the county, he had discretion to choose both times and locations, provided that the "temporary places of registration" served areas used by the public or where the population was concentrated, such as nursing homes, shopping centers, or county fairs. Again published notice was required to tell qualified voters where and when they could go to register. Ill. Rev. Stat. 1981, ch. 46, par. 4—6.3.

A third option permitted the clerk to appoint deputy registrars in a precinct. In doing so, he was required to deputize all precinct committeemen as precinct registrars who could then "*accept* registrations at any place within the precinct ***." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 46, par. 4—6.2.) Deputy registrars who were not precinct committeemen could accept registrations only "at such place as the county clerk designates at the time of appointment." (Ill. Rev. Stat. 1981, ch. 46, par. 4—6.2.) Deputy registrars, whether precinct committeemen or not, were permitted to "*accept* registrations at any time" except for those periods prior to elections during which the clerk was prohibited from accepting registrations in his office. (Emphasis added.) Ill. Rev. Stat. 1981, ch. 46, par. 4—6.2.

■■ In choosing to provide either a precinct registration or a temporary place of registration, the clerk was required to carry out registration at a fixed public location where qualified voters could expect to find registrars on duty during specific hours. Deputy registrars who were not precinct committeemen could accept registrations at any time but only at designated places. In these cases, the statute assumes that those who wish to register will come to the registrars. The role of the precinct committeeman who becomes a precinct registrar is consistent with this pattern. He may make himself available at any time or any place to accept registrations from those who wish to register. There is nothing in this enlarged availability which translates into a right to search out potential voters without regard to university regulations intended to protect student privacy and the educational process of the university. The solicitation policy of the university which provides registrars with table space in public areas during fixed times is fully consistent with the principles and purposes of the Election Code and Illinois Constitution.

■■ We agree with the trial court that registration is necessary to the right to vote, but we do not think that right has been infringed by the university's policy of barring registrars from door-to-door canvassing. The student remains at all times free to register at the clerk's office, at a temporary registration place if the clerk chooses to establish one in the public area of the campus, or in his own room if he wishes to

invite the deputy registrar there. No testimony has been offered to show that students were not free to register to vote on terms equal to those granted to other qualified voters. However, the university concedes that it raised no cross-appeal to the permanent injunction allowing registrars limited access to university housing. We, therefore, must affirm the permanent injunction.

For the foregoing reasons, the judgment of the circuit court of Jackson County is affirmed.

Affirmed.

HARRISON, P.J., and WELCH, J., concur.