Filed 1/25/22  Omicron Chapter of Kappa etc. v. University of Southern Cal. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| OMICRON CHAPTER OF KAPPA ALPHA THETA SORORITY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> UNIVERSITY OF SOUTHERN CALIFORNIA, <br><br> Defendant and Respondent. | B309916 <br><br> (Los Angeles County Super. Ct. No. BC711155) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa A. Beaudet, Judge.  Affirmed.

Kirkland & Ellis, R. Alexander Pilmer, for Plaintiffs and Appellants.

Paul Hastings, J. Al Latham, Jr. and Elizabeth S. Minoofar, for Defendant and Respondent.

The sorority and fraternity plaintiffs in this case[1] allege defendant University of Southern California (USC) violated Education Code section 94367 (section 94367), enacted as part of what is commonly known as the Leonard Law, by instituting a "deferred recruitment" policy that bars students from joining a fraternity or sorority (but no other student organization) until they have satisfied certain academic requirements. We consider whether the trial court properly granted USC's motion for summary judgment—a question that ultimately turns on whether the challenged policy is the product of USC's genuine academic judgment.

## I. BACKGROUND

### A. *Student Organizations at USC*

Plaintiffs, other Greek-letter organizations, and various other affinity groups are "recognized student organizations" (RSOs) at USC. Organizations with RSO status may, among other things, apply for university funding, reserve campus facilities for events, and use the university's name and trademarks. RSOs may limit their membership to students who "demonstrate support for the purpose of th[e] organization," and they may limit voting membership to students enrolled in a specific major, but they must otherwise be open to all USC students, staff, faculty, and alumni.

---

[1] Plaintiffs are the Alpha Upsilon Chapter of Sigma Chi Fraternity, the Gamma Tau Chapter of Beta Theta Pi Fraternity, the Beta Sigma Chapter of Tau Kappa Epsilon Fraternity, and the Omicron Chapter of Kappa Alpha Theta Sorority. Another plaintiff fraternity, the Alpha Nu Chapter of Theta Xi Fraternity, withdrew from this appeal.

Greek-letter organizations are unique among RSOs in not being required to accept all students who demonstrate support for their purpose.  They instead select members through the "rush" process, which involves a week of social events followed by a new member period when those students who receive and accept offers of membership participate in additional social events culminating in their initiation.

> **B.**     *USC's Academic Senate Twice Endorses Deferred Recruitment, Which USC's Student Government Body Opposes*

USC's Academic Senate adopted resolutions endorsing a policy of deferred recruitment for Greek-letter organizations in 1998 and 2015.  As explained by Dr. Ginger Clark, president of the Academic Senate from 2015 to 2016, the Academic Senate is "a governing body that represents the faculty voice in governance of the university."  The Academic Senate has no authority to enact university policy, but it adopts resolutions that it forwards to university administrators for consideration.

The 1998 resolution recognized Greek-letter organizations have "attained a commendable academic standing and . . . contributed to the social and intellectual life of undergraduate students," but emphasized "rush in the early weeks of the fall semester distracts entering freshmen from academic commitments . . . , may discourage them from exploring the range of academic and living opportunities available at USC (including residential colleges), and may inadvertently hinder their full integration into the broader university community."  The resolution urged the university to move rush from the fall to the spring semester and "to explore ways to cushion fraternities

3

and sororities from any adverse financial effects that this change might entail."

Minutes from the meeting at which this resolution was adopted (by an 11 to 10) vote reflect vigorous debate. Proponents argued, among other things, that rush placed "enormous pressures" on students that might impact their academic progress and students should have an opportunity to "acclimate[ ]" to university life before committing to a Greek-letter organization. Opponents argued deferred recruitment would limit students' freedom and suggested faculty should not interfere with "culture in an area that took time to develop." In the years immediately following the Academic Senate's adoption of this resolution, USC administrators did not make any changes in university policy.

The Academic Senate returned to the topic in 2015, however, and adopted another resolution, this time by a unanimous vote. The 2015 resolution, like the earlier 1998 resolution, recognized the "long tradition of Greek life" at USC and its role as "a valuable source of affiliation, socialization, leadership development, as well as opportunities for community service and philanthropy." But five paragraphs of findings followed, with the resolution ultimately advocating for adopting a deferred fraternity and sorority recruitment policy at USC.

The Academic Senate noted "[a]lmost 45% of first-year students pledge a Greek organization," which, for men, "involves seven weeks of new-member education on top of first-year coursework," and, for women, "means seven days of pledging prior to enrollment in their first USC class . . . ." Faculty reported "students missing class or coming to class exhausted," and the resolution emphasized "students who participate in

4

[r]ush on average have a lower GPA in their freshman year than those who do not."[2] The Academic Senate found new students may not be able to assess which Greek-letter organization is the best fit for them, and students who immediately commit to joining a Greek-letter organization "may be limiting their exposure to other outlets" for social interaction and affiliation. The Academic Senate further found "[m]any of [USC's] peer institutions have moved the initiation of . . . [rush] to the Spring semester in order to give students more time to get acclimated to university life," citing more than twenty schools that had done so.

In deposition testimony, Dr. Clark explained that, prior to the Academic Senate's adoption of the 2015 resolution, "faculty were frustrated that we had not done anything about the problems that we see each year with regard to our youngest students during fall rush." Faculty stated "their attendance rates went down during the rush period," students came to class late and fell asleep in class, and "there were reports of students coming to class still intoxicated from the night before." When faculty reached out to these students, "the students would talk about being involved in the rush process." Faculty members were also concerned "about the impact on brand-new students who

---

[2]    In her deposition, Dr. Clark explained the Academic Senate relied on "what the literature said about students who—during the period of rush that their GPA tends to fall off . . . ." The Academic Senate did not review data suggesting this effect was diminished when rush is delayed, but Dr. Clark explained they were "acting on . . . the idea that[ ] if students had more time to focus on developing their academic identity at the university, they would establish better skills; they would establish better relationships with faculty in the classroom, which could increase their motivation for . . . performing well in the classroom."

were rejected by either the sororities or the fraternities," and "many facult[y members] shared stories about students coming to them devastated after they didn't get in, crying in their offices." According to Dr. Clark, this issue came up "repeatedly among the faculty in the senate meetings," with faculty stating they "on multiple occasions, had female students coming to them in tears, distraught," because "their first experience associated with USC was that they don't belong here." These new students had no "exposure to any other significant experiences on campus in terms of other social organizations or other support networks."

The Academic Senate's adoption of the 2015 resolution prompted USC's undergraduate student government body to adopt its own contrary resolution opposing deferred recruitment. The student government's resolution cited, among other things, survey results indicating nearly all members of Greek-letter organizations at USC felt these organizations "helped them assimilate to the University" and most members belonged to at least one other organization. Bodies representing various Greek-letter organizations also prepared "reform plans" to address the Academic Senate's concerns. One of these groups, the Interfraternity Council, proposed an "alternative to deferred recruitment" in the form of rules including limits on the number of weeks and hours per week required for new member education, a "reaffirmed" commitment against hazing, prohibition of alcohol at new member events, and improved education regarding mental health and sexual assault.

*C.     USC's Student Affairs Office Considers Deferred Recruitment*

USC's Student Affairs Office began considering whether to implement a deferred recruitment policy beginning no later than 2014.  Dr. Monique Allard, the Senior Associate Vice Provost for Student Affairs, helped draft "numerous memoranda on this topic."  Among other things, the memos explained over twenty peer institutions had "some form of deferred recruitment" and reviewed a 2015 study indicating that approximately two-thirds of on-campus sexual assaults at USC took place at a fraternity or sorority house.

USC's residential college program, which groups students according to their academic interests and assigns resident faculty to provide academic and extracurricular enrichment, was discussed in connection with the question of whether to move to deferred recruitment.[3]  A February 2014 memorandum from Dr. Ainsley Carry, then Vice President for Student Affairs, sought "approval to initiate conversations with stakeholder groups to defer fraternity and sorority recruitment of *first-year students*

---

[3]     In a June 2016 report, a committee formed to recommend changes to the program noted that, "[b]eginning with the Dean's Hall of the 1980's, USC has experimented with residential colleges.  These experiments have been guided by the belief that education extends beyond the formal classroom and, therefore, that a residential college should be seen as an important site for learning."  A proposed "redesign" of the residential college program coincided to some degree with the development of USC Village, which would add over 2,600 residential spaces for undergraduates and "ensure [USC's] ability to house students on campus for at least two years and make it possible for them to form more long-term connections . . . ."

from the fall to spring term." Dr. Carry identified "the Greek-recruitment process" as "the most significant threat to the success" of the residential college program: "Although Greek life offers a number of important functions to a university community . . . , the new member recruitment timing and process can be disruptive to students' early development in college. Approximately 1,000 of the incoming class of 2,900 will participate in sorority or fraternity recruitment; that is 1,000 first-year students distracted from the Residential College program."

Dr. Carry's analysis of deferred recruitment was not limited to its potential impact on the residential college program. In the same February 2014 memorandum, Dr. Carry discussed proponents' arguments that such a policy would (1) afford new students the opportunity to "concentrate on solidifying their academic integration," emphasizing that "[a]lthough the overall Greek GPA is higher than the overall University [GPA], the freshman Greek GPA is below the overall freshman GPA"; (2) reduce unnecessary stress; (3) reduce social pressure to consume alcohol and provide "a one semester buffer for students to learn to manage their new found 'personal freedom'"; and (4) provide "greater opportunity to transition into the demands of college life and gain a better perspective on which organization is the best fit for them." Dr. Carry recognized the "highly delicate" nature of the issue and discussed several potential arguments in opposition to such a policy, including the paucity of "[f]ormal research on the effect of deferred recruitment" on academics, alcohol abuse, hazing, assault, and student development; the possibility that such a policy only delays problems; the prospect of unregulated "underground recruitment"; and the Greek-letter organizations'

impaired ability to recruit, train, and retain members. Dr. Carry's memo also acknowledged the argument that "[t]he ability to freely associate is a right guaranteed to students via the U.S. Constitution. . . ."

Dr. Carry raised many of the same considerations in a memorandum and presentation materials distributed to USC administrators in October 2015. In addition to concerns about students' academic performance and mental and physical well-being, Dr. Carry emphasized schools where residential colleges had been successful (Princeton University, Stanford University, Rice University, Vanderbilt University, University of Chicago, and University of Miami) had deferred recruitment policies. Dr. Carry supported the arguments in favor of deferred recruitment with citations to academic literature indicating "the recruitment and pledge semesters have a negative effect on academic performance," participation in Greek-letter organizations "often limits [first-year] students' involvement and relationships with diverse populations of other students," and "[d]eferring recruitment allows new students time to adjust and acclimate to campus life and culture prior to making the large commitment of time and energy to a single Greek-letter organization."

> D.  *USC Announces a Deferred Recruitment Policy and Continues to Study Its Anticipated Impact Prior to Its Effective Date*

In a letter to the "USC Community" sent in September 2017, Dr. Carry announced the university would be implementing a deferred recruitment policy after consultation with Greek-letter organizations and a review of feedback from parents, alumni, and students. Dr. Carry's letter acknowledged "Greek-letter

9

organizations enhance the student experience at USC by providing spaces for personal connection, brotherhood/sisterhood, academic support, and philanthropic engagement." He emphasized, however, that freshman year "is the toughest year of the transition to college life as students experience the most social and academic challenges" and he noted a "number of [USC's] peer institutions have implemented policies that support first-year students by allowing them time to acclimate to the university's academic and social climate before participating in Greek-letter organizations." According to Dr. Carry's letter, "the University . . . concluded that the benefit of allowing new students one semester to acclimate to USC academics and social life far outweigh the benefits of not making this policy change. Therefore, effective Fall 2018, all USC students who wish to participate in Greek organization recruitment must have completed a minimum of 12 academic units, and [must also have] a minimum USC grade point average of 2.5."[4] (Emphasis in original omitted.) Dr. Carry's letter acknowledged that "[s]pecifics remain on how to implement this policy change," and a task force chaired by Dr. Allard with representatives from Greek-letter organizations and other student groups would begin meeting the following month.

The Student Affairs Office continued to study the impact of deferred recruitment during the nearly one-year period between Dr. Carry's letter and the policy's effective date. Among other things, the appellate record includes a compilation of emails from administrators at other schools that Dr. Carry contacted for

---

[4]     As indicated in Dr. Carry's letter, students will generally complete 12 academic units in one semester.

comment regarding their deferred recruitment policies.[5] It also includes a report Dr. Carry requested comparing the grade point averages of USC fraternity pledges in fall 2017 to those of all male students. For freshmen in these groups, the average grade point average for male pledges was 2.96 compared to 3.19 for all male students. Across all class years, the average grade point average was 3.09 for male pledges and 3.33 for all male students.[6]

E.    *Several Fraternities and One Sorority Sue*
1.    *The pleadings and a request for injunctive relief*
In June 2018, plaintiffs filed a complaint alleging the deferred recruitment policy violates section 94367. In pertinent part, that statute provides: "No private postsecondary educational institution shall make or enforce a rule subjecting a student to disciplinary sanctions solely on the basis of conduct that is speech or other communication that, when engaged in outside the campus or facility of a private postsecondary institution, is protected from governmental restriction by the

---

[5]    Four of the five responses endorsed the policy, and the fifth indicated there was no data regarding the success of the policy because it had been in place for decades. One of the responses warned that a possible unintended consequence of deferred recruitment was "even more parties" in the fall as organizations tried to "put themselves at an advantage for spring recruitment."

[6]    In discovery, plaintiffs obtained data allowing for comparisons of "all Greek" and "all undergraduate" grade point averages. These figures are comparable in most recent years— the "all Greek" grade point average is sometimes higher than the "all undergraduate" grade point average—but the data are not broken down by class year.

11

First Amendment to the United States Constitution or Section 2 of Article I of the California Constitution."  (§ 94367, subd. (a).)

Plaintiffs' complaint alleged they had standing "to assert claims for violation of [section 94367] on their own behalf, and on behalf of their individual members."  They alleged deferred recruitment infringes their First Amendment right "to associate freely with those they choose" and, notwithstanding USC's stated purpose of ensuring students have one semester to acclimate to USC academics and social life, the policy is "blatantly discriminatory" because no other RSOs are subject to it.  Plaintiffs sought preliminary and permanent injunctive relief and a declaratory judgment that the deferred recruitment policy violates their First Amendment rights as protected by section 94367.

Shortly after filing the complaint, plaintiffs moved to preliminarily enjoin the deferred recruitment policy.  (*Omicron Chapter of Kappa Alpha Theta Sorority v. University of Southern California* (May 1, 2019, B292907, B294574) [nonpub. opn.] (*Omicron I*).)  The trial court denied the motion because plaintiffs had not demonstrated a likelihood of success on the merits.  The trial court later sustained USC's demurrer to the complaint without leave to amend.

### 2.    *Previous appeal*

Plaintiffs appealed the trial court's orders denying the preliminary injunction and dismissing the action, and we reversed.  (*Omicron I, supra*, B292907, B294574.)

We held that section 94367's protection of "speech or other communication" includes expressive association because such activity is "'closely linked' to First Amendment free speech rights

12

and, indeed, partly "'implicit in'" such speech rights." (*Ibid.*, citing *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings College of Law v. Martinez* (2010) 561 U.S. 661, 680 (*Christian Legal*); *Healy v. James* (1972) 408 U.S. 169, 181.) We emphasized, however, that "[t]here are First Amendment considerations on both sides in this case." (*Omicron I*, *supra*, B292907, B294574.) On plaintiffs' side, there is section 94367's statutory protection of plaintiffs' members' expressive association interests—specifically, their right to determine their membership. (*Ibid.*, citing *Yu v. University of La Verne* (2011) 196 Cal.App.4th 779, 790 [holding section 94367 does not "create or expand *constitutional* rights"].) On USC's side "is the constitutional First Amendment deference owed to a university's academic decisions." (*Omicron I*, *supra*, B292907, B294574.)

We held the significant effect or serious burden that is necessary to establish a violation of expressive association rights must be "strictly police[d]" where "a university's First Amendment interest in freedom to make genuine academic-based judgments as to the performance of its students is implicated." (*Omicron I*, *supra*, B292907, B294574.) Although the alleged burdens on plaintiffs' expressive associational rights were "insufficiently substantial to make out a section 94367 claim" when "stacked against the academic rationale that appears to animate the deferred recruitment policy," we concluded the trial court erred in sustaining USC's demurrer because plaintiffs alleged the policy was animated by viewpoint discrimination rather than a genuine academic judgment.[7] (*Ibid.*) We remanded

---

[7]    We came to the same conclusion applying a limited public forum analytical framework. Under this approach, the deferred recruitment policy violates plaintiffs' expressive association

13

for factual development so plaintiffs would have an opportunity to make their case.

### 3. *Summary judgment*

On remand, following an opportunity for discovery, USC moved for summary judgment. It argued there were no triable issues as to whether the deferred recruitment policy was the product of a genuine academic judgment or as to whether it was motivated by hostility to any viewpoint plaintiffs espouse. In opposition, plaintiffs challenged USC's academic judgment as based on anecdote and speculation and argued the policy discriminates based on viewpoint because it promotes USC's residential college program at the expense of Greek-letter organizations.

The trial court granted USC's motion. As to plaintiffs' argument that USC's academic judgment was based on questionable data and assumptions, the trial court reasoned that although "[p]laintiffs may find fault with the robustness of this evidence," their argument "that all of the data and information on which USC relied to make the decision to adopt deferred recruitment was not good enough" did not raise a triable issue as to whether the policy was based on a genuine academic judgment. Moreover, the bare fact that the deferred recruitment policy singled out Greek-letter organizations did not, in the court's view,

---

rights only if it is unreasonable in light of the purpose served by the RSO program or targets plaintiffs based on their viewpoint. (*Omicron I*, *supra*, B292907, B294574, citing *Christian Legal*, *supra*, 561 U.S. at 679, 685.) Although plaintiffs failed to allege unreasonableness, we held they must be given an opportunity to prove their allegation that the deferred recruitment policy is viewpoint-based.

14

raise a triable issue as to viewpoint discrimination. Evidence suggesting the Greek-letter organizations were singled out as a threat to the residential college program did not help plaintiffs because the perceived threat did not stem from any "viewpoint, . . . motivating ideology, . . . opinion, or . . . perspective."

## II.  DISCUSSION

As we recognized in *Omicron I*, *supra*, "universities occupy a special niche in our constitutional tradition." (*Grutter v. Bollinger* (2003) 539 U.S. 306, 329 (*Grutter*).) By virtue of section 94367, we permit inquiry into whether university policies are genuinely rooted in academic considerations so as to police the line prohibiting disfavored treatment of those espousing unpopular views—because of those views. But respect for universities' First Amendment interest in "educational autonomy" (*ibid.*) means we cannot superimpose our own views about how a university should best fulfill its academic mission when a university makes a bona fide academic determination.[8] We instead look to see if the facts reveal a good faith exercise of academic judgment even when, as is often the case with university-based endeavors, available information may be imperfect.

---

[8]  As we said in *Omicron I*, and as plaintiffs concede in this appeal, the term "academic" includes "the broad range of student educational experiences and outcomes with which a university may be legitimately concerned, not simply a narrow grade point average statistical analysis. (See, e.g., *Christian Legal*, *supra*, 561 U.S. at p. 686; *Grutter*, *supra*, 539 U.S. at p. 328.)."

The undisputed evidence establishes USC's deferred recruitment policy is a product of a genuine academic judgment and, as such, the burden the policy places on plaintiffs' expressive association rights is insufficiently serious to run afoul of section 94367. (See, e.g., *Boy Scouts of America v. Dale* (2000) 530 U.S. 640, 658-659 (*Dale*); *Roberts v. United States Jaycees* (1984) 468 U.S. 609, 626-627 (*Roberts*).) Plaintiffs argue that a reasonable fact-finder could nonetheless determine USC's academic rationale is a mere pretext for viewpoint discrimination (though plaintiffs avoid identifying in their appellate briefing any viewpoint to which USC might be hostile) because no other RSOs are subject to the deferred recruitment policy. As we will explain, this argument fails because there is undisputed evidence that fraternities and sororities are unlike other RSOs—including by virtue of the unique privilege they have to reject like-minded students who aspire to be members, which naturally results in a far more intensive and immersive recruitment process. Plaintiffs' alternative contention that USC sought to suppress plaintiffs' viewpoint as a "threat" to the residential college program also lacks merit. USC's preference for the residential college program—an academic initiative of the university—is not, as plaintiffs contend, analogous to a preference for one student organization over another.

### A.    *Standard of Review*

""""A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); [citation].) The moving party bears the burden of showing the court that the plaintiff "has not

16

established, and cannot reasonably expect to establish,'" the elements of his or her cause of action. [Citation.]" [Citation.] We review the trial court's decision de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party.' [Citation.]" (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 705.)

### B.     The Deferred Recruitment Policy Is a Product of USC's Genuine Academic Judgment

Courts have long recognized, in a variety of contexts, that universities' academic decisions are entitled to judicial deference. This deference flows, in part, from the specialized knowledge that informs many academic decisions. (See, e.g., *Christian Legal*, *supra*, 561 U.S. at 686 ["[J]udges lack the on-the-ground expertise and experience of school administrators"]; *Bd. of Curators of Univ. of Mo. v. Horowitz* (1978) 435 U.S. 78, 92 ["Courts are particularly ill-equipped to evaluate academic performance"]; *McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1788 [noting, in review of tenure decision, "it is far beyond the expertise of this, or any, court to evaluate the significance of [the petitioner's] research or writings in the area of probability theory or to judge the efficacy of his teaching"].)

Our deference to academic decisions is not, however, simply a recognition of the limits of judicial competence. As we emphasized in *Omicron I*, universities occupy a "special niche in our constitutional tradition" and the high court's cases "recognize[] a constitutional dimension, grounded in the First Amendment, of educational autonomy." (*Grutter*, *supra*, 539 U.S. at 329.) Academic freedom is "'a special concern of the First

Amendment,'" and "[w]hen judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment." (*Regents of University of Michigan v. Ewing* (1985) 474 U.S. 214, 225-226 (*Ewing*).) Such a decision should not be invalidated "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."[9] (*Id.* at 225.)

Academic decisions are not "confined to the classroom." (*Christian Legal*, *supra*, 561 U.S. at 686.) They include the broad

---

[9]    When First Amendment rights are at issue on both sides— i.e., when a school's First Amendment interest in academic autonomy runs up against students' or teachers' constitutional speech rights—the high court has indicated that academic judgments are owed "decent respect" as opposed to the "great respect" prescribed in *Ewing*. (*Christian Legal*, *supra*, 561 U.S. at 687.) In *Christian Legal*, a Christian-centered law school extracurricular organization asserted constitutionally-based First Amendment rights. (*Id.* at 673.) In that context, the law school's decisions about the character of its registered student organization program were due "decent respect," but the law school was owed "no deference" on the question of whether its policies were reasonable in light of the purpose of its student group program. (*Id.* at 686-687.) As we explained in *Omicron I*, plaintiffs in this case "do not (and cannot) directly assert constitutional free speech rights—their claim arises only by the grace of state statute—and that renders *Christian Legal*'s pronouncement on deference inapplicable. Moreover, the . . . [challenged] rules in *Christian Legal* were not facially predicated on judgments about student academic performance in the way that USC's deferred recruitment policy (at least 12 units and at least a 2.5 GPA) very much is." (*Omicron I*, *supra*, B292907, B294574.)

range of student educational experiences and outcomes with which a university may be legitimately concerned. "[E]xtracurricular programs are, today, essential parts of the educational process. [Citation.]" (*Ibid.*) The maintenance of a registered student organization program, in particular, which serves as "a mechanism through which [a school] confers certain benefits and pursues certain aspects of its educational mission" (*id.* at 702 (conc. opn. of Stevens, J.)), is a core academic concern.

With these principles in mind, we held in *Omicron I* that where a university's First Amendment interest in freedom to make genuine academic judgments is implicated, courts must strictly police the showing of a "'significant[] effect'" or "'serious burden[]'" necessary to prove a violation of expressive association rights. (*Omicron I*, *supra*, B292907, B294574, citing *Dale*, *supra*, 530 U.S. at 656; *Roberts*, *supra*, 468 U.S. at 626-627.) We further held that the cognizable impacts the deferred recruitment policy allegedly has on plaintiffs' expressive association rights—chiefly in the form of constraints on their ability to train members and the financial consequences of fewer members choosing to live in fraternity or sorority housing—satisfy this standard only if the policy is not a product of USC's genuine academic judgment.[10] (*Omicron I*, *supra*, B292907, B294574.)

---

[10] Refusing to acknowledge that their challenge to the deferred recruitment policy implicates academic freedom and educational autonomy, plaintiffs insist the issues in this case must be analyzed under the limited public forum framework discussed in prior cases, including *Christian Legal*, *supra*, 561 U.S. 661. (See *id.* at 679, 695 [restrictions on speech activity in a limited public forum must be reasonable in light of the purpose served by the forum and may not discriminate against speech on the basis of viewpoint].) Because we are not convinced the

The undisputed evidence demonstrates USC adopted its deferred recruitment policy based on academic concerns. This is evident on the very face of the policy itself: although the policy is often understood in shorthand fashion as prohibiting recruitment during a student's first semester, the policy more precisely understood imposes an undisputedly academic threshold, namely, completion of 12 units with at least a 2.5 grade point average. The use of these indisputably academic criteria (particularly the grade point average threshold) for joining a sorority or fraternity is, of course, strong evidence that the criteria were set for bona fide academic reasons.

Further demonstrating the genuine academic character of the recruitment policy change are the undisputed facts concerning the Academic Senate and the Student Affairs Office. The Academic Senate debated deferred recruitment on multiple occasions over the last several decades. In the most recent instance, when it unanimously approved a resolution supporting deferred recruitment, the Academic Senate made formal findings regarding fall recruitment's impact on students' grades, students' exposure to a variety of extracurricular activities, and the policies of peer institutions. As related by Dr. Clark, faculty members also discussed reports of students coming to class tired or intoxicated (or not coming at all) during the fall rush period and students suffering emotionally when they were not invited to join

_____

limited public forum test appropriately balances USC's rights, grounded in the First Amendment, against the statutory rights conferred by section 94367 (and because the result we reach would be no different under the limited public forum rubric), we structure our discussion using what we find to be the appropriate analytical framework.

their preferred Greek-letter organization. The Student Affairs Office endorsed deferred recruitment based on academic literature suggesting recruitment and pledge semesters impact students' grades; USC's comparisons of first-year grades (i.e., Dr. Carry's pre-announcement comparison of the "freshman Greek GPA" to the "overall freshman GPA" plus his post-announcement comparison of USC fraternity pledge grades to grades of all male students); and other indicia of student learning, including new students' physical and emotional well-being and their ability to explore the campus's full range of student organizations. The Student Affairs Office also concluded deferred recruitment would contribute to the success of USC's residential college program, noting that peer schools with successful programs do not allow Greek-letter organizations to recruit first-semester students. Then, in the period between announcing the policy and its effective date, the Student Affairs Office considered feedback from other schools that adopted deferred recruitment.

Plaintiffs, however, assert the deferred recruitment policy is not an exercise of genuine academic judgment because the Academic Senate and Student Affairs Office made their decisions based on incomplete or incorrect facts. Plaintiffs specifically question whether any of the Academic Senate's considerations were based on "admissible evidence" and argue, for instance, that the Academic Senate supported deferred recruitment based only on "stale anecdotes" and "collected no data about students' GPAs and collected no data about how many times students supposedly were distraught or in tears because they were not accepted by a sorority." Academic Senate proceedings and USC administrator deliberations are not, however, governed by the Evidence Code, and the deference owed to genuine academic judgments is not

21

conditioned on their being made in a manner befitting a search warrant affidavit. A university's decisions about what to teach, who may be admitted to study, and how they should be taught may in time be revealed to be misguided or mistaken, but the key for our purposes is whether the considerations apparently animating a decision are of a type so unusual for a university to consider, so trivial, so ignorant of counterpoints, or so post-hoc as to suggest the existence of a material dispute of fact as to whether something other than a judgment about how to best educate its students was at work.

There is no such evidence on the summary judgment record here. For example, the Academic Senate's consideration of academic literature regarding the impact of rush on student grades is precisely the type of evidence one would expect a university to consider and plaintiffs far overstate the matter in asserting the literature has "nothing to do" with academics at USC.[11] Similarly, contrary to plaintiffs' assertion, Dr. Clark's deposition testimony acknowledging that "alcohol consumption among first-year students is not limited to those who are involved in the Greek system" does not prove USC's concern about excessive drinking at events hosted by Greek-letter organizations

___

[11] Plaintiffs' contention that the Academic Senate "knew the USC Greek community performed *better* academically than USC's overall student body" is not supported by the record. Plaintiffs cite a 2015 memorandum from Dr. Allard to Dr. Carey noting that "[a]t USC the overall Greek GPA is reportedly higher than the general undergraduate student population," but "'pledge' semester performance has [not] yet been evaluated." Plaintiffs cite no evidence that this memorandum was presented to the Academic Senate, and it does not refute the broader academic literature regarding rush-semester grades in any case.

(based, among other things, on past disciplinary actions and the disproportionate number of "alcohol transports" from fraternity houses compared to other campus spaces) is somehow disingenuous. Plaintiffs also argue "[t]here is no data" supporting USC's view that its policy will "alleviate any of the purported issues." The idea that academic judgments can be grounded only in quantitative data is unfounded (indeed, were it otherwise, USC's humanities program may be in trouble). But here, USC did consider a significant amount of data: academic literature, practices and experiences at peer institutions (including almost uniformly positive feedback from administrators at these institutions that implemented a deferred recruitment policy), grade comparisons, and reported faculty experiences in the classroom.

Plaintiffs also argue sorority plaintiff Kappa Alpha Theta (in contrast to the fraternity plaintiffs) has no history itself of facilitating excessive drinking or enabling sexual assault. Assuming this is true as an empirical matter, drinking and sexual assault were not the sum total of the university's apparent concerns. The record also indicates, without dispute, that USC considered the adverse effects of rejection on students—including young women—soon after arriving on campus and the intensive rush process that draws substantial time and attention away from other pursuits and at times left students exhausted when first beginning classes. Moreover, even if drinking and sexual assault *were* the only concerns such that the deferred recruitment policy could have been more narrowly tailored, the lack of such a tight fit between means and ends is not the sort of gross defect upon which a factfinder could rely to conclude some more sinister

motive was at work rather than a bona fide judgment that deferred recruitment would be academically beneficial.

Plaintiffs also mount a procedural attack on the trial court's summary judgment ruling, arguing the facts recited in USC's separate statement of undisputed material facts are not supported by the evidence. This too is unpersuasive. To take one example, USC's assertion that the deferred recruitment policy was motivated in part by "several recent incidents of personal injury or death that occurred at or after fraternity social events at USC" cannot be discarded, as plaintiffs say, because there is an "absence of specifics" about these incidents.[12] To take another example, Dr. Allard's inability to recall any events between fall 2016 and fall 2017 that prompted USC to announce the deferred recruitment policy does not create a triable issue as to the asserted fact that "[i]n Summer 2017, following the death of a fraternity member at Penn State due to new member hazing, Dr. Carry indicated that he did not want USC to wait to act until [USC] experienced a tragedy like that." The asserted fact

---

[12] Plaintiffs contend the memorandum cited as evidence of this undisputed fact "says nothing whatsoever about 'several' or even any 'recent' injuries." That strikes us as nitpicking. The 2017 memorandum from Dr. Carry to the provost states "the 2015 [Association of American Universities] Climate Survey demonstrates that a disproportionate number of sexual assaults happened in Greek houses. Furthermore, the number of student injuries or death associated with new member education activities in Greek houses is unacceptable." The appellate record does not include a copy of the survey, but a letter announcing its findings indicates it included data specific to USC. We accordingly read Dr. Carry's memorandum to imply there was— or at least that he believed there was—more than one instance of student injury or death documented in the climate survey.

24

concerns Dr. Carry's statements, which are memorialized in an email in the appellate record.

C.      *There Is No Evidence of Viewpoint Discrimination*

Notwithstanding our review of the evidence thus far, and without identifying any viewpoint they hold to which USC is hostile, plaintiffs maintain there is a triable issue as to whether USC's academic rationale for deferred recruitment is actually a pretext for viewpoint discrimination.[13] Plaintiffs suggest there is no need for them to identify a disfavored viewpoint because the fact that no other RSOs are subject to deferred recruitment supports an inference that USC must have singled out Greek-letter organizations based on *some* viewpoint.

Plaintiffs' argument rests on a misreading of *Christian Legal,* in which the Supreme Court held that a public law school's requirement that student organizations accept "*all* comers" (even those who disagreed with the plaintiff organization's core beliefs) was viewpoint neutral. (*Christian Legal, supra,* 561 U.S. at 694-695.) From the high court's observation that "[i]t is . . . hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers" (*id.* at 694), plaintiffs somehow derive the rule that a school may single out student organizations that do not accept all comers only if every other student organization *is* required to accept all comers.

_____

[13] Plaintiffs argue in their opening brief that "USC may not object to [plaintiffs'] mission statements," but it is nonetheless "hostil[e] to [plaintiffs'] expression of that viewpoint." In the context of assessing whether USC's deferred recruitment policy is viewpoint neutral, the distinction is illusory.

Plaintiffs say, for instance, that at USC "the Young Democratic Socialist club may exclude students who have joined the USC College Republicans, and vice versa" and conclude from this that there can be no viewpoint-neutral basis to prohibit first-semester recruiting by Greek-letter organizations and not these groups. But *Christian Legal* focused on the defendant law school's all-comers policy only because that was the policy challenged in that case. The fact that USC does not require RSOs to accept all comers does not place Greek-letter organizations on the same footing as campus political groups. While political groups and other RSOs are required to accept *all comers who demonstrate support for their organization's purpose*, Greek-letter organizations are not. To the extent that plaintiffs alone are entitled to exclude prospective members for non-ideological reasons, the fact that other RSOs are not subject to this policy does not mean viewpoint discrimination is afoot. (*Christian Legal*, *supra*, 561 U.S. at 695-696 ["'[T]he fact that [a restriction] cover[s] people with a particular viewpoint does not itself render the [restriction] content or viewpoint based'"].)

Just as important, this unique privilege given to Greek-letter organizations at USC—they may freely reject even like-minded aspiring members—has important practical implications: their process of recruitment and indoctrination is necessarily more intensive and immersive than other RSOs. (Otherwise, how could they decide whom to reject and whom to admit?) This undisputed fact provides a further basis for treating fraternities and sororities differently than other RSOs and undercuts any suggestion that a factfinder could find viewpoint discrimination (whatever the viewpoint might be) based merely on the deferred recruitment rules that apply only to Greek-letter organizations.

Plaintiffs also assert that Dr. Carry's characterization of Greek-letter organizations as a "threat" to USC's residential college program proves viewpoint discrimination. But the threat that Dr. Carry described has nothing to do with the views of Greek-letter organizations. There is no evidence, for instance, Dr. Carry was alarmed that plaintiff Sigma Chi's commitment to the "three timeless principles" of "friendship," "justice," and "learning" subverts competing values espoused by the residential college program. In fact, at the very same time that Dr. Carry characterized the perceived impact of fraternities and sororities on the residential college program, he also praised Greek-letter organizations' contributions to the university community. Nothing in the appellate record suggests plaintiffs and their members are prohibited from discussing their values with first-semester students in a non-recruitment context. Plaintiffs' unrestricted freedom to interact with second-semester students with a satisfactory academic record further underscores that deferred recruitment is unrelated to any viewpoint they hold. In context of the full record, the "threat" comment is a (perhaps inartful) proxy for all we have already summarized: the university's judgment about the outsized, and in some respects unique, impacts that fraternities and sororities have on learning by students when they first arrive on campus.

There is also no merit to plaintiffs' suggestion that USC's interest in the success of its residential college program is tantamount to a preference for one category of RSOs over another. Plaintiffs' argument that USC may not "license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules" (*R.A.V. v. St. Paul* (1992) 505 U.S. 377, 392) imagines a debate where there is none. The residential

college program is not just another student organization, but a university initiative with an academic focus.  Regulating Greek-letter organizations' recruitment practices to promote the success of the residential college program is no more viewpoint-oriented than promoting attendance during classes or instituting a hypothetical ban on RSOs holding mandatory meetings during finals week.  USC's determination that Greek-letter organizations distract students from the residential college program to a degree that other RSOs do not is a legitimate exercise of academic judgment.

## DISPOSITION

The judgment is affirmed.  USC is awarded its costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.

KIM, J.